Michael James **SCIARRINO**, Plaintiff,

v.

**MUNICIPAL CREDIT UNION and William Porter**, Defendants.

No. CV 91 1147 (RJD).

United States District Court, E.D. New York.

Aug. 7, 1995.

Andrew Lavoott Bluestone, New York City, for plaintiff.

Mark S. Gamell, Hart & Hume, New York City, for defendants.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

Plaintiff, Michael Sciarrino, is an Italian–American. He worked at Municipal Credit Union ("MCU") for approximately twelve years before he was asked to resign in February, 1990. He subsequently sued MCU and William Porter, MCU's African–American President and Chief Executive Officer, alleging reverse discrimination in violation of Title VII and 42 U.S.C. § 1981. Defendants moved for summary judgment and attorney's fees.

### *BACKGROUND*

Defendant MCU is a cooperative membership banking organization chartered by New York State. In 1977, the New York State Banking Department took control of MCU due to concerns about the institution's operating capabilities. The Banking Department assumed the responsibilities previously exercised by the private board of directors.

Plaintiff began working at MCU in 1978 as an assistant internal auditor. In 1981, William Porter, an African–American, joined MCU as its first President and Chief Executive Officer since the Banking Department takeover four years earlier. At that time, Norman Kohn, a Caucasian who had been employed at MCU since 1977, became Chief Financial Officer.

In 1983, Porter promoted plaintiff to the position of Manager of the Internal Audit Department. In that capacity, plaintiff reported to Porter and Kohn. In 1984, the State Banking Department returned control of MCU to an elected board of directors and responsibility for the internal audit function was transferred from management to MCU's Supervisory Committee. Thereafter, all internal auditing employees, including plaintiff, reported to the Supervisory Committee and not to management.

By order dated May 28, 1987, the State Banking Department ordered MCU to correct certain deficiencies, including deficien-

cies in the internal auditing function and the collections function. Affidavit of Norman Kohn, Exhibit A ("Kohn Affidavit"). To that end, the Board of Directors, Supervisory Committee, and management decided that the Internal Audit Department needed a more experienced chief auditor. The Supervisory Committee recruited Donald Barba, an Italian–American, as Chief Internal Auditor in 1988. Barba was superior to plaintiff in the hierarchy of the Internal Audit Department, but plaintiff kept his salary, benefits, and title as Manager of the Internal Audit Department.

According to the affidavits of Porter, Kohn, and Steven Presberg, who was chairman of the Supervisory Committee during the relevant time period, Barba told Presberg shortly after he began working at MCU that he was dissatisfied with plaintiff's performance and no longer wanted him in the Internal Audit Department. Barba gave plaintiff a poor performance review in the spring of 1989 and recommended that plaintiff be transferred to another department. Kohn Affidavit, Exhibit B. Presberg and Porter state in their affidavits that the Supervisory Committee was prepared to terminate plaintiff if Barba requested such action, and that Presberg relayed this information to Porter. Affidavit of William Porter, at 4 ("Porter Affidavit"); Affidavit of Steven Presberg, at 3.

Once it became clear that plaintiff would not be retained as an employee in the Internal Audit Department, the senior management, including Porter, attempted to find another place for plaintiff at MCU. In June 1989, Michealangelo DeSantis, Director of Credit Operations, who oversaw the Collections Department, suggested that plaintiff be transferred to head the Collections Department. Kohn Affidavit, at 6; Porter Affidavit, at 4. Plaintiff appeared to be qualified for the position, as he had audited the Collections Department in the past and had worked as a part-time collector. According to Mr. Kohn, plaintiff had previously expressed interest in the Collections Department. Kohn Affidavit, at 7. Although one of the technical requirements for the position is three years of experience in consumer collections, Porter

thought plaintiff could handle the job in light of his prior collections experience, and he waived that requirement. Deposition of William Porter, at 43.

Porter discussed the transfer with plaintiff. Plaintiff ultimately accepted the transfer, and began work in July 1989 as Assistant Manager of the Collections Department, then the top management post in the department. Porter Affidavit, at 4–5. As Assistant Manager, plaintiff reported to DeSantis and Kohn, who had by then become Chief Operating Officer. Plaintiff kept the same salary he had had in his prior position as Manager of the Internal Audit Department, but once again reported to management, rather than to the Supervisory Committee.

In the fall of 1989, problems were detected in the Collections Department concerning Visa charge-offs. At MCU, a loan is charged-off and reported as a loss when it becomes seven months delinquent. In the State Banking Department's May 1987 order, the Banking Department had focused on deficiencies in the Collections Department and ordered MCU to improve its reporting, to ensure that charge-offs and delinquent accounts were handled properly. In September 1989, DeSantis reported to Kohn that the fourth quarter 1989 charge-off for delinquent Visa accounts was an estimated $108,000. Kohn used that figure to prepare his reports to federal and state regulators and to determine MCU's year-end fiscal position. Kohn Affidavit, at 10.

As a result of an investigation in December 1989, Kohn discovered that the Collections Department had underestimated the Visa charge-off by $600,000. Kohn found that plaintiff had not calculated his Visa charge-off estimates from the "trial balance" available from MCU's outside dataprocessor, despite the fact that the information necessary to properly calculate charge-offs had been available from that trial balance. Kohn Affidavit, at 11; Kohn Affidavit, Exhibit D. Furthermore, Kohn discovered that, contrary to instructions from his superiors, plaintiff had reassigned three collectors who were working on delinquent accounts and directed them to work on "special projects" and Visa recoveries, i.e., collections on Visa loans al-

ready charged off. As a result, nearly $1 million in Visa delinquencies had not been worked from September 1989 through December 1989, resulting in a greatly increased charge-off for the last quarter of the year. Kohn Affidavit, at 11–12; Kohn Affidavit, Exhibit F, p. 2, Exhibit G, p. 1.

Kohn asked DeSantis for some explanations concerning the problems in the Collections Department. Finding the proffered explanation unsatisfactory, Kohn conducted further investigation. Kohn Affidavit, at 11–12. He ultimately determined that both DeSantis and plaintiff had acted incompetently and should no longer be employed in any capacity at MCU. Kohn had been keeping Porter apprised of the situation as it unfolded and, at a meeting with Porter in January 1990, he requested authorization to ask both DeSantis and Sciarrino to resign with severance packages. Mr. Porter authorized him to proceed. Kohn Affidavit, at 12–14; Porter Affidavit, at 6–7. Kohn's findings with respect to the Collections Department debacle are memorialized in several memos. Kohn Affidavit, Exhibits D–G.

Kohn met with DeSantis in January 1990, shortly after his meeting with Porter. DeSantis resigned and accepted a severance package. On February 1, 1990, Kohn made Sciarrino an offer of resignation and severance. When Sciarrino asked for more money, Porter authorized a moderate increase. Sciarrino accepted the package and signed a written agreement and release that Kohn had prepared. Porter then signed the agreement on behalf of MCU. Kohn Affidavit, at 14–15, Exhibit H; Porter Affidavit, at 7–8. Effective February 1, 1990, George Stumpp, a Caucasian, replaced plaintiff as head of the Collections Department. Affidavit of Debra Heller, Exhibit A. Because of his experience, he was given the title Manager of the Collections Department. He selected Ahmed Campbell, an African–American, to be Assistant Manager. When Stumpp died in 1990, Campbell took over and Daniel Levin, a Jewish man, became Assistant Manager. When Campbell left, Carlo D'Angelo, an Italian–American, became head of the Collections Department and is now Vice–President in

charge of Collections and General Services. Kohn Affidavit, at 15–16.

Currently, there are two Italian–Americans on MCU's Board of Directors, including the Chairman of the Board. In addition, Italian–Americans serve as Senior Vice President/General Counsel, Vice President/Deputy General Counsel, Vice President of Mortgage Operations, Vice President in charge of Internal Auditing, and Vice President in charge of Business Development. Kohn Affidavit, at 15–16.

Plaintiff claims that he was asked to resign because Porter does not like Italian–Americans. Affidavit of Michael Sciarrino, ¶ 21 ("Sciarrino Affidavit"); Deposition of Michael Sciarrino, at 74 ("Sciarrino Deposition"). He contends that he was never qualified for the job in the Collections Department, and that Porter assured him he would be transferred if the job in the Collections Department did not work out. Sciarrino Affidavit, ¶'s 16–17. He points to the fact that his predecessor in the Collections Department, an African–American named David Luckey, was transferred to Loan Operations after being relieved of his responsibilities in the Collections Department. Sciarrino Affidavit, ¶ 17. Plaintiff implies that his transfer to the Collections Department was merely a ploy to submit him to the control of Porter, who planned all along to fire him when he did not perform well in the Collections Department.

Plaintiff claims that DeSantis alone was responsible for the problems in the Collections Department. According to plaintiff, although he had the top title in the Collections Department, DeSantis was the de facto head of the department. Plaintiff insists that he had no responsibility for assigning work to collectors, but simply followed DeSantis' directions. Sciarrino Affidavit, ¶ 18.

Plaintiff admits that Porter never made any statements or took any action to indicate that he is prejudiced against Caucasians in general or Italian–Americans in particular. Sciarrino Deposition, at 83–84. He does contend, in support of his claim, that Porter took only African–American employees out to lunch upon their retirement. Sciarrino Deposition, at 83. He also complains that Porter transferred the Internal Audit Depart-

ment to the South Bronx, requiring plaintiff to take a dangerous subway ride to work. Sciarrino Deposition, at 91–93. Finally, he claims without documentation or evidentiary support that every white employee in the Collections Department was fired between 1980 and 1990. Sciarrino Deposition, at 75.

## DISCUSSION

### I. Plaintiff's § 1981 Claim

█ As a preliminary matter, the Court notes that, regardless of whether it has any merit, plaintiff's claim under § 1981 is not cognizable. In *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court held that § 1981 did not apply to post-employment conduct, including termination. *See also Patterson v. Intercoast Management of Hartford,* 918 F.2d 12 (2d Cir.1990), *cert. denied,* 500 U.S. 906, 111 S.Ct. 1686, 114 L.Ed.2d 81 (1991). Section 101 of the Civil Rights Act of 1991 overturned *Patterson,* but the Supreme Court has stated that section 101 is not retroactive. *Rivers v. Roadway Express, Inc.,* —— U.S. ——, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). Because plaintiff was discharged before Congress enacted the Civil Rights Act of 1991, his claim is not cognizable under § 1981.

### II. Proof in a Title VII Case

█ Under the Supreme Court decisions in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), claims of racial discrimination in violation of Title VII or section 1981 are analyzed under a three-part test. First, plaintiff must establish a prima facie case of discrimination by showing by a preponderance of the evidence the following: 1) he belongs to a protected class; 2) his job performance was satisfactory; 3) he was discharged; and 4) his discharge occurred in circumstances giving rise to an inference of racial discrimination. *See Ramseur v. Chase Manhattan Bank,* 865 F.2d 460 (2d Cir.1989); *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184 (2d Cir.1987). The defendant must then articulate a legitimate non-discriminatory rea-

son for the discharge which, if believed by the trier of fact, would support a finding that the defendant's actions were not motivated by unlawful discrimination. The plaintiff must then prove by a preponderance of the evidence that defendant's proffered reason was pretextual and that racial discrimination was the true cause of the discharge. *Viola v. Philips Medical Systems of North America,* 42 F.3d 712, 715–16 (2d Cir.1994) (citing *Woroski v. Nashua Corp.,* 31 F.3d 105, 108 (2d Cir.1994)). *See also Spence v. Maryland Casualty Co.,* 995 F.2d 1147, 1155 (2d Cir. 1993); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1225 (2d Cir.1994).

### A. Prima Facie Case

█ Plaintiff has failed to make out a prima facie case for discrimination. He satisfies the first and third prongs. He belongs to a protected class for the purposes of Title VII and section 1981 analysis. *See Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184 (2d Cir.1987). He was discharged on February 1, 1990.

With respect to the second prong, the evidence, including the poor performance report from Barba, the affidavits of Kohn and Porter, and the undisputed evidence concerning the charge-off debacle, indicates that plaintiff was not performing his job satisfactorily. The only evidence plaintiff offers is his own assertion that he had essentially no responsibilities in the Collections Department and that all of the problems were solely DeSantis' fault. This assertion is squarely contradicted by everything else in the record, including plaintiff's job title and Porter's deposition testimony, in which he points to a job description stating that one of the functions of the Assistant Manager of Collections is to assign work to the collections staff. Porter Deposition, at 28. Plaintiff has not presented a single affidavit from a collections agent indicating that he had no control over their work. And in a memorandum from DeSantis to Kohn, DeSantis indicates that the collec-

tions agents told DeSantis that Sciarrino had pulled them off Visa collections to work on recoveries and special projects. Kohn Affidavit, Exhibit F, at 2. Saving only plaintiff's unsupported, self-serving claims to the contrary, all available evidence indicates that plaintiff's job performance was unsatisfactory. Moreover, as defendants point out, an integral part of plaintiff's own argument is that he was not qualified for the job in the Collections Department.

■ Plaintiff's theory that Porter reassigned him to the Collections Department without the necessary background and experience in order to create a pretext for his dismissal and that this plot was racially motivated requires that the Court take the *McDonnell Douglas* test a step further. Plaintiff has failed to meet his burden on the fourth prong of the *McDonnell Douglas* test. His discharge did not take place under circumstances giving rise to an inference of racial discrimination. Plaintiff was discharged in the wake of a costly mistake by the department he was running, shortly after he had been transferred due to poor performance in his prior position. His work deficiencies had been brought to Porter's attention by plaintiff's supervisor, an Italian–American. There is no evidence before the Court that Porter was prejudiced against Italian–Americans. Porter had promoted plaintiff in the past and Kohn, not Porter, actually determined that plaintiff should be terminated. Porter simply approved Kohn's understandable recommendation.

In the face of overwhelming evidence that he performed poorly in his job as Manager of the Internal Audit Department and was at least partially responsible for gross errors in the Collections Department, plaintiff offers only his insistence that he has been unfairly blamed for serious problems in the Collections Department by a white supervisor or supervisors, and his belief that the African–American President, motivated by racial animus, seized upon these circumstances to fire a man whom he had previously protected and promoted. Considering the evidence before the Court, if there arises an inference of racial discrimination, the Court is unable to identify it.

B. *Legitimate Explanation*

As the *McDonnell Douglas* analysis continues, if indeed it should, plaintiff's claims fare no better. Defendants have clearly met their burden of advancing a legitimate, nondiscriminatory explanation for plaintiff's discharge. They have submitted several detailed affidavits, along with contemporaneous memoranda, to support their contention that plaintiff was asked to resign because of poor performance.

C. *Proof of Pretext*

■ Plaintiff has offered no credible evidence whatsoever to suggest that the reasons given for his discharge are pretextual and that he was asked to leave because he is an Italian–American. The evidence he offers to suggest that Porter was prejudiced against Italians consists of his assertions that 1) Porter went out to lunch with African–American employees when they retired, but not white employees; 2) Porter transferred the Internal Audit Department to the South Bronx, requiring plaintiff to take a dangerous train ride; 3) Porter told him he could transfer jobs if the job in the Collections Department did not work out; 4) African–Americans were offered transfers to other departments when they were not succeeding; and 5) all of the white employees in the Collections Department were fired between 1980 and February 1990.

Porter explained that he takes no employees out to lunch, but goes to retirement lunches when asked, and there is absolutely no reason to discredit this explanation. Porter Affidavit, at 9. Plaintiff's complaint about the transfer to the South Bronx does not warrant discussion. As for the promise Porter allegedly made when plaintiff was transferred to the Collections Department, Porter has stated that he made no such promise. Porter Affidavit, at 5. Even if he did, it is understandable that he would nevertheless agree to ask plaintiff to resign in light of the severe problems that plagued the Collections Department under plaintiff's watch. With respect to plaintiff's assertion that similarly situated African–American employees were granted transfers, the record contains

**108**

evidence that one African–American employee, David Luckey, who preceded plaintiff in the Collections Department, was transferred to another position. However, plaintiff provides absolutely no evidence concerning the circumstances of that transfer, and does not provide evidence of any special consideration given to other African–American employees. As for his claim that all the white employees of the Collections Department were fired, he presents no evidence to support that assertion.

Porter once promoted plaintiff and subsequently transferred him to a position in the Collections Department even after his performance was sharply criticized by his superior and even after the Supervisory Committee indicated its willingness to fire him. Plaintiff's contention that Porter was prejudiced against him borders on the absurd. Even if there were a shred of evidence to suggest that Porter were prejudiced, it was Kohn, a Caucasian, who determined that plaintiff should be asked to resign. There is simply no competent evidence to suggest that plaintiff was asked to resign because he is an Italian–American.

### III. *Summary Judgment in a Title VII Case*

In *Meiri v. Dacon*, the Second Circuit warned that "summary judgment is ordinarily inappropriate in employment discrimination cases, "where an individual's intent and state of mind are implicated." 759 F.2d 989, 998 (2d Cir.1985), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). The court went on to say, however, that the "mere incantation of intent or state of mind" cannot be used as a "talisman to defeat an otherwise valid motion [for summary judgment]" and that purely conclusory allegations of discrimination, standing alone, are insufficient to defeat such a motion. *Id.*

In response to defendants' summary judgment motion, plaintiff has presented nothing but conclusory allegations that Mr. Porter discriminated against him. All of the evidence in the records indicates that plaintiff was asked to resign due to poor work performance. Summary judgment is granted in favor of the defendants.

SO ORDERED.