**Ann KOTLOWSKI, Plaintiff,**

v.

**EASTMAN KODAK CO., Defendant.**

No. 94–CV–6028L.

United States District Court,
W.D. New York.

April 16, 1996.

---

Theodore S. Kantor, Bilgore, Reich, Levine, Kroll & Kantor, Rochester, NY, for plaintiff.

Marion Blankopf, Nixon, Hargrave, Devans & Doyle LLP, Rochester, NY, for defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

This discrimination case is brought pursuant to the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.;* the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.;* the

Equal Pay Act ("EPA"), 29 U.S.C. § 206(d); Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.;* and the New York Human Rights Law ("NYHRL"), N.Y.Exec.Law § 290 *et seq.*

Plaintiff Ann Kotlowski ("Kotlowski") claims that she was laid off from her employment with Eastman Kodak Co. ("Kodak"), and denied other employment opportunities at Kodak, because of her disability (depression), her age, her gender, and in retaliation for complaining about discriminatory treatment. She also alleges that, while employed, she was denied pay and promotions equal to that of comparable males.

Presently before me is Kodak's motion for summary judgment dismissing all plaintiff's claims. For the reasons set forth below, Kodak's motion is granted.

## FACTUAL BACKGROUND

Kotlowski was employed at Kodak from 1978 to December 1993, at which time she and a number of other Kodak employees were permanently laid off. Kotlowski was 47 years old when her employment was terminated.

From 1986 to December 1993 Kotlowski was employed in various clerical positions in the Materials Management Organization ("MMO"). From July 1991 to December 1993 she was an Administrative Services Assistant under the supervision of Bernard Law.

Kotlowski had a history of chronic absenteeism and tardiness. These problems are documented in performance evaluations beginning in May 1989, and thereafter in September 1989, January 1991, June 1992, January 1992, September 1992, January 1993 and, finally, May 1993. Her performance appraisals are otherwise average to below average.

Kotlowski also had a history of requesting and receiving leaves of absence due to various personal and medical problems (not depression). At her physician's request, Kodak repeatedly renewed a special parking permit for her because of problems with Kotlowski's knee. And for one month in 1992, Kodak permitted Kotlowski to start her work day at 8:30 rather than 7:30. Despite this accommodation, Kotlowski was tardy on 9 of the 12 days that she worked during that month. She was absent altogether for the rest of the month.

On May 11, 1993 she was issued an "Awareness Warning" memo by her supervisor, Bernard Law. The Awareness Warning memo notified Kotlowski that failure to improve her continued tardiness could result in further disciplinary action, a "Final Warning", or termination. Kotlowski's receipt of the memo suspended her ability to receive a transfer, a promotion, or a pay increase. It also precluded her from utilizing Kodak's internal placement services, for 6 months.

Shortly thereafter, Kodak's Medical Department Coordinator received a letter dated May 24, 1993, from Dr. David Gaesser, Ed. D., a counselor whom Kotlowski had seen intermittently since 1990. In the letter, Dr. Gaesser noted that Kotlowski had returned to treatment with him as of that month; that she suffered from "signs of depression;" that "part of her difficulty with depression is her hypersomnia"; and that it would be of benefit to her if her work day could start at 8:00 rather than 7:30. Kodak accommodated this request.

This May 24th letter was the first written request made by Kotlowski for any accommodation due to her alleged depression. Kodak's policy at all relevant times was to require written requests from physicians before making any medical accommodation. Kotlowski was aware of this policy. Kotlowski was also aware that information provided to the Medical Department was considered confidential and not disclosed to anyone— including supervisors.

Roughly two weeks after requesting and obtaining this accommodation, Kotlowski requested a leave of absence. Kodak granted this request. Kotlowski did not return to work for roughly one month, at which time she came back on a part-time basis. In the interim, Kotlowski's immediate work group had been dissolved. Thus, when Kotlowski returned she returned to a different job with a different supervisor. Although she worked only in the afternoon, Kotlowski's chronic lateness persisted.

On or about August 16, 1993 Kotlowski filed an administrative complaint with the New York State Division of Human Rights ("NYSDHR") charging that the Awareness Warning memo was unfair because Kodak failed to accommodate her alleged disability. The complaint also alleged that Kodak denied her salary increases due to her disability, age and sex.

Also during the month of August, the MMO group began a "downsizing selection process" in an effort to reduce operating costs. MMO group managers and supervisors conducted a so-called "ranking session" for the purpose of evaluating every "business support" employee, including Kotlowski. At these sessions each employee's job performance was ranked according to the following factors: analysis, effectiveness, execution, innovativeness, technical skill and business skills. According to Carroll Anderson, the Human Resources Representative for the MMO division, there was absolutely no discussion by anyone at the ranking session of any employee's age, sex, or medical condition. Nor was there any discussion of Kotlowski's attendance or tardiness records, or her recently filed EEOC charge. Bernard Law, Kotlowski's immediate supervisor throughout 1991 and 1993, did not take part in this ranking session. Only Regis Rocco, Law's supervisor, took part.

Kotlowski received the lowest rating of all evaluated employees, based upon her substantive performance only. Accordingly, she was laid off October 4th, effective December 5, 1993.

Kotlowski filed another NYSDHR complaint on November 8, 1993, alleging that she was laid off in retaliation for her earlier NYSDHR filing.

Despite the fact that Kotlowski had received an Awareness Warning in May 1993 (which prohibited her from participating in Kodak's internal job search program for six months), she was permitted to and did apply for a number of other positions within Kodak. However, she did not secure any of those jobs.

This action was commenced on January 19, 1994. Kotlowski asserts that she was laid off because of her disability (depression) in violation of the ADA and the NYHRL. She also alleges that she was laid off because of her age and/or sex, in violation of Title VII, the ADEA, and the NYHRL. She also alleges that she was laid off and then denied other jobs at Kodak in retaliation for filing the NYSDHR complaint. Finally, she asserts that she was denied equal pay, in violation of the EPA.

### DISCUSSION

#### A. Summary Judgment Standards:

Pursuant to Fed.R.Civ.P. 56(c), a moving party is entitled to a judgment as a matter of law if there is "no genuine issue as to any material fact" and where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden is on the moving party to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). After the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, supra, at 586, 106 S.Ct. at 1356. "[T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e) (alteration in original)). However, at the summary judgment stage, when perusing the record to determine whether a rational factfinder could find for the non-moving party, all reasonable inferences must be drawn in favor of the non-moving party. See Murray v. National Broadcasting Co., 844 F.2d 988, 992 (2d Cir.), cert. denied, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).

The general principles underlying a motion for summary judgment apply no less to this action simply because it is an employment discrimination case. It is true that courts exercise caution when considering whether to grant summary judgment in cases where an employer's intent is at issue. See,

*e.g., Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994). However, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 40 (2d Cir.1994). For a plaintiff in a discrimination case to survive a motion for summary judgment, he or she must do more than present "conclusory allegations of discrimination," *Meiri v. Dacon,* 759 F.2d 989 (2d Cir.) *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); he or she must offer "concrete particulars" to substantiate the claim. *Id., cited in, Duprey v. Prudential Ins. Co.,* 910 F.Supp. 879 (N.D.N.Y.1996).

**B.  Summary Judgment Analysis in Discrimination Cases:**

When analyzing a summary judgment motion in a discrimination case, courts apply the three step analytical framework first set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined by *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Viola v. Philips Medical Systems,* 42 F.3d 712 (2d Cir.1994) (applying *McDonnell Douglas* in an ADEA case); *Heilweil v. Mt. Sinai Hospital,* 32 F.3d 718, 721–22 (2d Cir.1994) (applying *McDonnell Douglas* in a Rehabilitation Act case); *Duprey, supra,* (applying *McDonnell Douglas* in an ADA case). The three steps are as follows:

> [f]irst the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection ..." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94 (quoting *McDonnell Douglas,* 411

U.S. at 802, 804, 93 S.Ct. at 1824, 1825). On summary judgment the plaintiff is not required to meet the burden of proving its case by a preponderance of the evidence, she need only establish a prima facie case by producing evidence sufficient to support a reasonable inference of discrimination. *Foster v. Arcata Assoc., Inc.,* 772 F.2d 1453, 1459 (9th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986). A defendant can still prevail on summary judgment if it can articulate a legitimate business reason for its action *and* if plaintiff is unable to produce evidence that defendant's proffered explanation is pretextual.

**C.  ADA Claim:**

To establish a prima facie case under the ADA, Kotlowski must show: (1) that she is "disabled" (as defined in the Act); (2) that she was qualified to perform the basic functions of her job; and (3) that she was terminated because of her disability. See *Heilweil, supra,* at 722; *Wernick v. Federal Reserve Bank of New York,* 1995 WL 598973 (S.D.N.Y.1995) ("The elements of a prima facie case under the ADA are the same as the first 3 prongs of the Rehabilitation Act" (29 U.S.C. § 794(d)).

Kotlowski claims that her disability is depression, and that she has been depressed for several years. She claims that this depression has caused her to be tardy in the mornings and has at times prevented her from coming to work at all. Kotlowski further alleges that her tardiness was exacerbated by the effects of an antidepressant medication she was taking at times during the 1990 through 1993 time period. This drug, which she took at night, allegedly left her so groggy in the morning that she could not get to work on time.

**(i) Kotlowski Was Not "Disabled"**

Under the ADA, a "disability" is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

"Major life activities" means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 CFR § 1630.2(i). In this case, Kotlowski does not assert that her depression substantially limits her ability to care for herself, perform manual tasks, walk, see, hear, speak or learn. Kotlowski's primary claim is that her depression prevents her getting out of bed early enough to work the early morning hours required by Kodak.

With respect to the major life activity of working, the term "substantially limits" means:

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. **The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.** 20 C.F.R. § 1630.2(3)(i).

Depression appears to constitute a "mental impairment" under the ADA. *See Fitzgerald v. Alleghany Corp.,* 904 F.Supp. 223, 229 (S.D.N.Y.1995). However, to sustain her ADA claim, Kotlowski must do more than invoke the term. *See, e.g., Pritchard v. Southern Co. Services, Inc.,* 1995 WL 338662, *6 (N.D.Ala.1995) ("[a]lthough depression constitutes a 'physical or mental impairment' under the ADA, it does not rise to the level of a 'disability' unless it substantially limits a major life activity"). Because she claims that her depression prevented her from working, Kotlowski must demonstrate that it **substantially limited** her ability to work at not only her then existing job, but any job. Based upon a review of the evidence presented on this motion, I find that she has failed to do so.

Since 1990, Kotlowski has been treated by three different mental health professionals: David L. Gaesser, Ed.D., who treated her off and on from March 1990 through July 1993; Norman J. Pointer, M.D., who treated her from July 1993 to November 1993; and Anthony Papciak, Ph.D., who administered one test in August 1993 and has treated her regularly from November 1993 through the present. Deposition transcripts (or pertinent portions thereof) of each of these physicians have been submitted by the parties for the Court's consideration in this matter.

Drs. Gaesser and Papciak opined that during their respective treatment of Kotlowski, she suffered(s) from "mild to moderate" depression. Papciak Depo. at 23 (mild, intermittent depression); Gaesser Depo. at 13, 63 (clinically depressed). Dr. Pointer testified that, while he initially thought Kotlowski was depressed, this opinion changed after a few sessions. Pointer Depo. at 11. Indeed, Dr. Pointer ultimately concluded that Kotlowski was not depressed, that her chronic lateness was a function of "personality style" (*Id.* at 35), and that she generally could be described as seeking "secondary gain"—meaning that Kotlowski was looking to be taken care of by others. *Id.* at 62. Dr. Gaesser too opined that Kotlowski's lateness was "a personality thing." Gaesser Depo. at 22.

All of these treating doctors testified that Kotlowski was chronically late for her appointments whether they were scheduled in the late morning, afternoon, or evening. Papciak Depo. at 42–43; Gaesser Depo at 22; Pointer Depo at 34. Even for her own therapy sessions, Kotlowski's tardiness was not limited to early morning appointments.

Both Drs. Papciak and Pointer testified that, despite her depressive symptoms, nothing about Kotlowski's condition was so severe as to prevent her from working. Papciak Depo. at 23, 33; Pointer Depo. at 14. Dr. Gaesser testified that he encouraged Kotlowski to stay at work, at least part time, rather than remain home. Gaesser Depo. at 77–78.

All of above testimony suggests that Kotlowski's condition should not have prevented her from working.

Additionally, an independent evaluation was performed, at Kodak's request, by Teresa R. Miller, M.D. Dr. Miller's opinion was formed based upon a review of the other doctor's records and deposition transcripts. She did not interview or personally evaluate Kotlowski.

Dr. Miller found that "Ms. Kotlowski's emotional state during 1992–93 was a reflection of her minor depression and her his-

trionic personality style. Her depression should not have interfered with her ability to function, either in the workplace or in her personal life." Miller Report, Blankopf Aff't at Ex. K.

Dr. Miller further opined that, of the three treating professionals, Dr. Pointer was the only licensed medical doctor and, thus, the only one to possess the medical education necessary to understand fully both the psychological and the physiological aspects of Kotlowski's condition. Indeed, Dr. Miller noted that Dr. Gaesser, whose educational background includes neither a psychology degree nor a medical degree, testified incorrectly about the effects of certain medications. Dr. Miller further criticized Papciak noting that his failure to treat "histrionic personality elements" might be impeding his treatment of Kotlowski and prolonging her symptoms.

With respect to the antidepressant medication Kotlowski had been taking intermittently since 1990, the treating doctors generally agreed that this drug could cause drowsiness and, therefore, should be taken at night. However, each indicated that the drowsiness should wear off within 12 hours and any lingering morning grogginess could be offset by various measures, including taking the drug earlier in the evening and drinking coffee or eating first thing in the morning.

The doctors informed Kotlowski of these corrective measures and none testified that the drug, taken correctly, should have prevented Kotlowski from arriving at work on time.

Moreover, it is unclear as to whether Kotlowski was even taking this drug during the January–May 1993 time period. She had stopped seeing Dr. Gaesser during this period and there is no evidence that she had renewed a previous prescription. Dr. Gaesser testified that Kotlowski was ambivalent about taking antidepressant medication and did so only intermittently. Gaesser Depo. at 28–30, 64.

Based upon the professional opinion of all the doctors, I conclude that any depression suffered by Kotlowski (including the effects of any medication) did not substantially limit her ability to work. Thus, I find that she was not "disabled," under the ADA.

#### (ii) Kotlowski Was Not Otherwise Qualified

■ I further note that even if Kotlowski were "disabled" she does not otherwise appear to be "qualified" for her job, because of her attendance and tardiness problems.

As noted, Kotlowski's attendance and tardiness problems are well documented. Indeed, problems in both attendance and tardiness are recorded in performance evaluations as early as May 1989 (by supervisors other than Bernard Law). Kotlowski does not dispute these attendance and tardiness problems.

There is also evidence that Kodak attempted to assist Kotlowski on more than one occasion by allowing her to start her job at a later time, and by permitting numerous medical leaves of absence.

The ADA does not require an employer to accommodate an employee who cannot get to work. Kotlowski's inability to get to work on time, if at all, made her unqualified to perform the functions of her job. *See, e.g., Hunt–Golliday v. Metropolitan Water Reclamation District of Greater Chicago*, 1996 WL 22971 (N.D.Ill.1996) (citing *Vande Zande v. State of Wis. Dept. Admin.*, 44 F.3d 538, 544 (7th Cir.1995) (Attendance and acceptance of supervision are generally considered to be essential job functions)); *Carr v. Reno*, 23 F.3d 525, 530 (D.C.Cir.1994) (an employee must be present in order to perform the essential functions of a job); *see also Misek–Falkoff v. IBM Corp.*, 854 F.Supp. 215 (S.D.N.Y.1994) ("Some degree of regular, predictable attendance is fundamental to most jobs"), *aff'd*, 60 F.3d 811 (2d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 522, 133 L.Ed.2d 429 (1995) and —— U.S. ——, 116 S.Ct. 1333, 134 L.Ed.2d 484 (1996).

#### (iii) Kotlowski Was Not Terminated Because of Depression

Finally, I note that there is no evidence that Kotlowski's termination was motivated

by discrimination. Kotlowski makes only conclusory allegations on this point. In part, Kotlowski relies on the deposition testimony of Marilyn Paille, a friend and co-worker to support her claim. However, Paille's deposition testimony does not advance Kotlowski's claim.

Paille was a supervisor in 1990 and 1992 and, in that capacity, attended certain ranking sessions that occurred in those years. She testified that, at the ranking sessions she attended, any employee's health would have been discussed if the employee had missed a lot of time from work. Paille Depo. at 42. However, Paille did not attend the 1993 ranking session at which Kotlowski received her low rating and, therefore, she had no personal knowledge whatsoever about that session.[1] Therefore, it is difficult to see how this testimony would be admissible at trial.

Moreover, Paille also testified that she knew of no employee who was "marked" for adverse employment action because of what they had revealed to Kodak's Medical Department. *Id.* at 75–76. To the extent medical information was revealed to supervisors, Paille admits that the employees in question may have given permission. *Id.* at 76–77.

Finally, Paille did not even work in the same building as Kotlowski during the relevant time period. *Id.* at 47. Thus, her knowledge about Kotlowski's work performance and relationship with Law was based entirely upon what Kotlowski told her. *Id.* at 37–38, 49–50. This testimony would, therefore, also be inadmissible. Thus, Paille's testimony does not advance Kotlowski's case. I find that Kotlowski's ADA claim must be dismissed.[2]

### D. *Title VII and ADEA Wrongful Termination Claims:*

Kotlowski additionally (or alternatively) asserts that she was laid off due to her sex and/or age, in violation of Title VII and the ADEA.

Title VII provides that it "shall be an unlawful employment practice for an employer to . . . discharge any individual, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1). The ADEA extends this prohibition to age, for individuals who are at least 40 years of age. 29 U.S.C. § 623(a)(1).

▆ To establish a prima facie case of wrongful termination under Title VII or the ADEA, Kotlowski must show that: (1) she is a member of the protected category; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of age or sex discrimination. *See Viola, supra,* at 716, *citing McDonnell Douglas, supra.*

▆ In cases such as this one, involving lay-offs, the first two prongs of the *McDonnell Douglas* test are often easily met: plaintiff articulates a prima facie case and the defendant proffers a legitimate down-sizing procedure as the reason for the lay-off. Thus, the analysis often turns on the last prong of the *McDonnell Douglas* test, *i.e.,* whether a plaintiff can established that the rationale offered was a mere pretext for discrimination. *See Viola, supra,* at 716. Accordingly, to defeat an employer's motion for summary judgment, "a plaintiff must show that there is a material issue of fact as to whether (1) the employer's asserted reason

---

1. Those who attended the 1993 ranking session have submitted sworn statements that Kotlowski's ranking was based solely upon her performance and not her attendance or tardiness problems. *See* Aff't of Carroll Anderson at ¶ 8; Aff't of Regis Rocco at ¶ 11.

2. Similarly, there is no evidence to support a claim that Kodak did not accommodate Kotlowski's "disability." Not only is the record replete with examples of Kodak permitting medical leaves of absence in the past and also accommodating her requests for special parking privileges, but Kotlowski admits that she never provided her

physician's request for accommodation due to depression until **after** the Awareness Warning memo about which she complains. And although Kotlowski maintains that she spoke openly with Law and others about her depression, she admits that she was aware of Kodak's policy requiring written requests prior to any accommodation. Thus, she cannot claim that Kodak failed to accommodate her depression. *See, e.g., Goodwin v. Keuka College,* 94–CV–6291T, — F.Supp. — [1995 WL 865470] (W.D.N.Y.1995) (in order to accommodate a disability, an employer must be notified of its existence).

for discharge is false or unworthy of belief and (2) [it is] more likely than not that the employee's age was the real reason for the discharge." *Id., citing, Woroski v. Nashua Corp.*, 31 F.3d 105 (2d Cir.1994).

In this case, it is not at all clear that Kotlowski has established a prima facie case of age or sex discrimination. While Kotlowski is a member of two relevant protected classes (she is a woman and she is over 40), it is not clear that she was qualified for her position or that her layoff occurred under circumstances giving rise to an inference of age or sex discrimination.

However, even if Kotlowski could establish a prima facie case of discriminatory discharge under Title VII and the ADEA, she has not adequately rebutted Kodak's evidence that she was laid off for legitimate reasons: performance inadequacies. Kotlowski has failed to produce any compelling evidence that Kodak's proffered explanation is false, and that the reason for her discharge was more likely than not discriminatory. *Viola* at 716, 717.

Kotlowski relies on three things to support her claims of age/sex discrimination: her own testimony; the deposition testimony of former colleagues Marilyn Paille and Sharon Jarvis; and Kodak's statistical records of who was re-hired after the layoffs. None of these provides adequate support for her claim.

#### (i) Kotlowski's Testimony

Kotlowski's deposition testimony reveals that she had a difficult relationship with her supervisor, Bernard Law, and that he was not easy to work for. According to Kotlowski, she and Law bickered like a married couple. Kotlowski Depo. at 80. Law berated her for her professional shortcomings and told her she had fallen through the cracks. *Id.* at 119. Law hovered around her cubicle, making her feel very nervous and pressured. He would sometimes tell her that stress was good for her. *Id.* at 187–88, 280.

Law told Kotlowski that she was a hypochondriac and he tried to work with her to modify her chronic lateness. *Id.* at 135.

Kotlowski admits that Law acted as though his statements and actions toward her were done in her best interest. *Id.* at 312.

Law's treatment of Kotlowski appears unkind or at least difficult in many respects. I do not doubt that, based upon Kotlowski's testimony, Law may have been a difficult person for whom to work. However, his comments do not appear to be gender or age based and, thus, cannot sustain a Title VII or ADEA claim.

The only specific comments made by Law that were arguably gender/age based were those relating to the length of Kotlowski's skirts. According to Kotlowski, Law repeatedly commented that the length of Kotlowski's skirts was too short, that she should dress more conservatively, and that people would perceive her in a negative way. *Id.* at 447–449.

Kotlowski claims that Law did not voice similar concerns about another, younger female who worked nearby (but for a different supervisor) and who wore equally short skirts. Kotlowski claims that Law said the other woman "looked fine." Thus, Kotlowski inferred that Law's comments to her were age based. (She does not appear to assert that these comments were sex based.)

These comments do not raise a material issue of fact as to whether Kodak's stated reason for terminating Kotlowski was false, and that Kotlowski's age was more likely than not the reason for her discharge. It is not entirely unreasonable that a supervisor would demand a professional appearance by his staff. More important, however, there is no evidence that Law's sentiments were passed on to his supervisors who actually made the ranking and layoff decisions. There is no evidence whatsoever that the decision makers had any knowledge or opinion on these matters.

Given the totality of evidence in this case regarding Kotlowski's performance problems, and the fact that Law was not the individual who made the ranking determinations, I do not find Law's comments sufficient to create an inference that Kodak's stated reasons for Kotlowski's termination were false and that Kotlowski's age was

more likely than not the reason for her lay-off. *See Viola, supra,* at 718 (although plaintiff advanced some evidence in an attempt to demonstrate pretext, no rational jury could find that the employer's decision to terminate was motivated by age bias); *Woroski, supra,* at 109–110 (while plaintiff did advance some evidence of age bias, court found that "some evidence is not sufficient to withstand a properly supported motion for summary judgment"); *Sciarrino v. Municipal Credit Union,* 894 F.Supp. 102 (E.D.N.Y.1995) (plaintiff's conclusory allegations of discrimination failed to rebut his employer's stated reason for discharge).

### (ii) Paille and Jarvis' Deposition Testimony

██ Marilyn Paille's deposition testimony is not helpful. Paille testified that a number of people in the office often commented about the length of Kotlowski's skirts. Paille Depo. at 58–60. However, Paille did not identify Bernard Law, Regis Rocco, or any other person with supervisory control over Kotlowski, as making those comments. Indeed, they were made by Kotlowski's professional peers.[3] Again, such stray comments by other employees who did not supervise plaintiff do not rebut Kodak's stated reason for Kotlowski's termination.

██ Sharon Jarvis' testimony is also unavailing. Jarvis was another colleague of Kotlowski's. Her deposition testimony consists of vague generalizations about what she (Jarvis) believed motivated Law's comments about Kotlowski's dress. Jarvis Depo. at 47–49. The admissibility at trial of this testimony is doubtful. Moreover, Jarvis never heard Law say that Kotlowski wore her skirts too short for her age. *Id.* at 49. Finally, Jarvis testified that she did not think Kodak practiced age discrimination against Kotlowski or anybody else. *Id.* at 25.

Thus, neither Paille or Jarvis' testimony creates an inference that Kodak's stated rea-

sons for Kotlowski's termination were false and that Kotlowski's age or sex was more likely than not the reason for her termination.

### (iii) Statistical Information

██ Finally, Kotlowski alleges that a substantial number of those employees targeted for layoff in 1993 were over 40 and that after the layoff, Kodak "redeployed" only younger women and men. Kotlowski suggests that this is illustrated by the statistical evidence produced by Kodak. However, the statistics do not support Kotlowski's claim; in fact, they tend to defeat it.

The ages of those employees targeted for layoff are meaningless without knowing the ages of the entire pool of employees considered for layoff. These numbers are absent from plaintiff's papers.

With respect to the "redeployment" figures, Kotlowski was one of roughly 250 applicants for 29 positions. (Kotlowski actually only filled out 6 job applications, but one of the jobs apparently had openings for 24 individuals.) Of the 250 applicants, 51% were over 40 and 72% were female. Of those hired, 12 were over 40 and 24 were women. These hiring figures are consistent with the ratio of applicants and do not suggest any type of discrimination.[4]

Thus, Kotlowski has failed to adequately rebut Kodak's stated basis for her termination. Her age and sex discrimination claims must be dismissed.

### E. *Title VII Retaliation Claim:*

Kotlowski additionally asserts that she was laid off and failed to be redeployed within Kodak, in retaliation for filing a complaint with the NYSDHR. Title VII prohibits an employer from taking any adverse employment action against an employee who complains about an unlawful practice.

---

**3.** Paille noted that she herself would not wear skirts as short as Kotlowski's because "she didn't feel comfortable." Paille Depo. at 60.

**4.** These figures do not suggest that any significant number of individuals who were redeployed

were "substantially younger" than Kotlowski who was 47 when terminated. *See O'Connor v. Consolidated Coin Caterers,* —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).

Absent direct proof, "[t]he order and allocation of burdens of proof in retaliation cases follow that of general disparate treatment analysis as set forth in *McDonnell Douglas Corp. v. Green* ..." *Sumner v. U.S. Postal Service,* 899 F.2d 203, 208 (2d Cir.1990) (citations omitted). To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) protected participation or opposition under Title VII known by the alleged retaliator, (2) an employment action disadvantaging the person engaged in the protected activity and (3) a causal connection between the protected activity and the disadvantageous employment action. *DeCintio v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d Cir. 1987) (emphasis in original) (citations omitted), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). "Proof of a causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment ..." *Id.*

Here, Kotlowski participated in protected activity by filing her NYSDHR complaint. And her termination is undeniably a "disadvantageous employment action taken against her." Finally, because Kotlowski was terminated approximately two months after filing the administrative complaint, she has adequately pleaded a causal relationship between her protected activity and the adverse employment action. *Manoharan v. Columbia U. Col. of Phys. & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988) ("Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.") (citations omitted). Thus, Kotlowski has established a prima facie case of retaliation.

However, Kodak has also met its burden by providing evidence that retaliatory motive played no part in the termination decision. Carroll Anderson, Kodak's Human Resources officer who took part in the MMO department downsizing, has testified that there was no discussion at the ranking session of Kotlowski's EEOC complaint. Anderson Aff't ¶ 8. This testimony is supported by the affidavit of Regis Rocco, who was Bernard Law's direct supervisor. Rocco stated that "[t]here was absolutely no discussion by anyone at the ranking session of Ann Kotlowski's ... EEOC charge." Rocco Aff't at ¶ 11. Indeed, Rocco further stated that he "was not aware that Ann Kotlowski had filed an EEOC charge at the time I ranked her and the other MMO employees. I did not learn she had filed a charge until a later date." *Id.* at ¶ 12.

Anderson further stated that while Kodak routinely attempts to "redeploy" all employees targeted for layoff, Kotlowski's redeployment was withdrawn after Anderson had a chance to review Kotlowski's personnel file and determine that she was on probationary status. Anderson Aff't, Second. Kodak's policy and practice during the 1993 MMO downsizing was that employees whose jobs were eliminated would not be offered an alternate position if the employee was on warning status. *Id.* at ¶ 2. The stated reason for this was that if an employee is not performing well in his or her current position, a new or different supervisor should not have to accept that employee until the performance problems have been corrected. *Id.*

Thus, although Anderson initially attempted to identify alternative jobs for all those employees targeted for lay-off, including Kotlowski, Kotlowski was never offered "redeployment" because Anderson subsequently learned that Kotlowski was on probationary status. *Id.* at ¶¶ 3, 4, and 5.[5]

Other than conclusory allegations, Kotlowski offers nothing to rebut Kodak's explanation. Kotlowski appears to assert that her failure to subsequently get a job through the internal job placement services at Kodak is further evidence of retaliation. However, Kotlowski admits that she does not know anything about why she failed to get those jobs: she did not know who made the hiring decision, and she conceded that she had no knowledge as to whether that individual had

5. This course of action was consistent with the terms of the May 11, 1993 Awareness Warning memo issued to Kotlowski, which specifically stated "[w]hile on Awareness Warning, you may not be eligible for rate adjustments, performance increases, transfers, [etc.]" Ex. 14 to Blankopf Aff't.

any knowledge of her NYSDHR complaint or her age. Furthermore, she admits that hundreds of laid off individuals applied for these limited positions. Kotlowski Depo. at 240–244. In short, Kotlowski offers no compelling evidence whatsoever that retaliation played a role in her inability to obtain any one of these jobs and to find otherwise, the jury would have to rely on pure speculation or surmise.

Thus, I find that Kotlowski has failed to adequately demonstrate that Kodak's stated reasons for its actions were pretextual. Kotlowski's retaliation claim must be dismissed.

### F. *EPA Claim:*

■ Finally, Kotlowski claims that while employed by Kodak she was denied promotions and pay increases that were provided to men in comparable positions. In support of this claim Kotlowski states that she never received a wage upgrade. She further offers her subjective beliefs that "men were getting ahead faster than women" Kotlowski Depo. at 283, 286–87. There was no evidence produced to support these conclusory opinions. These conclusory claims are insufficient to establish a prima facie case under the EPA.

The deposition testimony of Sharon Jarvis is equally unavailing. Jarvis too offers only conclusory allegations that men got ahead faster than women. Jarvis Depo. at 14–15. None of these vague allegations can support a claim under the EPA. Accordingly, this claim too must be dismissed.

### CONCLUSION

■ For all the above reasons, I hereby GRANT defendant Kodak's motion for summary judgment. Kotlowski's complaint is dismissed in its entirety.[6]

IT IS SO ORDERED.

---

6. Plaintiff's claims brought pursuant to the NYHRL are dismissed as well. The legal standards for establishing age, sex or disability discrimination claims under the NYHRL are comparable to the standards under the ADA, the ADEA, and Title VII (*see Song v. Ives Laborato-* *ries, Inc.*, 957 F.2d 1041 (2d Cir.1992); *Mohamed v. Marriott International, Inc.*, 905 F.Supp. 141 (S.D.N.Y.1995). Thus, in this case, the absence of elements to sustain the plaintiff's federal claims compel dismissal of plaintiff's state law claims, as well.