**Thomas A. WILLIAMS and Robin E. Pellegrini, Plaintiffs,**

**v.**

**COUNTY OF NASSAU, Thomas R. Suozzi, in his official and individual capacities, Nassau County Civil Service Commission, John H. Senko, Jr., in his official and individual capacities, James F. Demos, in his official and individual capacities, David J. Gugerty, in his official and individual capacities, Anthony M. Cancellieri, in his official and individual capacities, John Donnelly, in his official and individual capacities, Nassau County Office of Housing and Inter–Governmental Affairs, Peter Sylver, in his official and individual capacities, Bruce Nyman, in his official and individual capacities, and Patricia Bourne, in her official and individual capacities, Defendants.**

No. 03–CV–6337(RRM)(ETB).

United States District Court, E.D. New York.

Jan. 22, 2010.

Frederick K. Brewington, Law Offices of Frederick K. Brewington, Hempstead, NY, for Plaintiffs.

David Bruce Goldin, Bernadette K. Ford, Carl S. Sandel, Liora M. Ben–Sorek, Nancy Nicotra, Mineola, NY, Kevin G. McMorrow, Ahmuty, Demers & McManus, New York, NY, for Defendants.

### *MEMORANDUM & ORDER*

MAUSKOPF, District Judge.

Plaintiffs, Thomas A. Williams and Robin E. Pellegrini, commenced the instant civil rights action asserting various causes of action against the County of Nassau, the Nassau County Civil Service Commission ("CSC"), the Nassau County Office of Housing and Intergovernmental Affairs

("OHIA"), and the following individuals, all county employees, both in their individual and official capacities: Thomas R. Suozzi, John H. Senko, James F. Demos, David J. Gugerty, Anthony M. Cancellieri, John Donnelly, Peter Sylver, Bruce Nyman, and Patricia Bourne (collectively, the "County Defendants").[1] Defendants moved for summary judgment (Docket Nos. 126–138), which motion was respectfully referred to United States Magistrate Judge E. Thomas Boyle. Now before this Court is Judge Boyle's Report and Recommendation (Docket No. 143), recommending that Defendants' motion be granted in part and denied in part, Defendants' timely objections to certain portions of the Report (Docket Nos. 145, 147), and Plaintiffs' opposition to those objections (Docket No. 146).

## A. Standard of Review

Rule 72 of the Federal Rules of Civil Procedure permits magistrate judges to conduct proceedings on dispositive pretrial matters without the consent of the parties. Fed.R.Civ.P. 72(b). If any party timely serves and files written objections to a magistrate judge's report and recommendation on a dispositive motion, the district court must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed.R.Civ.P. 72(b)(3). The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* The district court is not required to review the factual or legal conclusions of the magistrate judge as to those portions of a report and recommen-

dation to which no objections are addressed, see *Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), and instead reviews those portions for clear error, see *Covey v. Simonton,* 481 F.Supp.2d 224, 226 (E.D.N.Y.2007).

## B. Dismissal of Claims

First, no party has objected to those portions of the Magistrate Judge's Report recommending the grant of summary judgment with respect to the following claims alleged in the Amended Complaint: 1) Williams' conspiracy claim pursuant to 42 U.S.C. § 1983 (second cause of action); 2) Pellegrini's claim for race and color discrimination pursuant to Title VII, 42 U.S.C. § 2000e *et seq.* (first cause of action); 3) Pellegrini's age discrimination claim pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 623 (fourth cause of action); and 4) Plaintiffs' whistleblower claims pursuant to the New York State Civil Service Law § 75–b (sixth cause of action.) Having reviewed the Report for clear error, and finding none, summary judgment is GRANTED as to these claims. Moreover, the Magistrate Judge recommended that OHIA be dismissed from this action on the grounds that it is an administrative agency of the County of Nassau with no legal identity separate and apart from that of the County. As no party objects, and this Court finding no clear error in the Magistrate Judge's Report, OHIA is DISMISSED as a party to this action.

## C. Defendants' Objections

Defendants allege that the Magistrate Judge erred by 1) concluding that Plaintiffs' speech was made in their capacity as

---

**1.** By Order dated March 31, 2005 (Docket No. 61), Judge Sandra Feuerstein dismissed several claims against these, and other defendants named in the Amended Complaint (Docket No. 17). By stipulated Order entered October 19, 2007, Plaintiffs voluntarily dismissed claims against defendants Robert Schoelle, Jr., Carol Kramer, Marguerite Costello, and Charles Fowler. As such, the defendants named here are those that remain. This case was transferred to the undersigned on December 26, 2007.

private citizens upon a matter of public concern; 2) failing to dismiss all claims against the County Defendants as a result of the recommendation to dismiss the conspiracy claim brought pursuant to 42 U.S.C. § 1983; and 3) by denying the County Defendants qualified immunity.

Upon *de novo* review of the Report and the record upon which it is based, and upon careful consideration of the Defendants' objections, the Court overrules the objections, and accepts and adopts Magistrate Judge Boyle's Report and Recommendations in its entirety.

## CONCLUSION

Summary judgment is GRANTED as to 1) Williams' conspiracy claim pursuant to 42 U.S.C. § 1983 (second cause of action); 2) Pellegrini's claim of race and color discrimination pursuant to Title VII, 42 U.S.C. § 2000e *et seq.* (first cause of action); 3) Pellegrini's age discrimination claim pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 623 (fourth cause of action); and 4) plaintiffs' whistleblower claims pursuant to the New York State Civil Service Law § 75–b (sixth cause of action.) Summary judgment is DENIED as to Williams' and Pellegrini's claims of First Amendment retaliation pursuant to 42 U.S.C. § 1983 (second and third causes of action). Defendant Nassau County Office of Housing and Intergovernmental Affairs is DISMISSED from this action, and all defendants not previously dismissed remain parties. Qualified immunity is DENIED.

The Court hereby recommits this matter to Magistrate Judge Boyle for further pretrial proceedings, including settlement discussions if appropriate. By February 12, 2010, the parties are ORDERED to file a Joint Pretrial Order, under the supervision of the Magistrate Judge, consistent with this Order and in compliance with this Court's Individual Motion Practices and Rules.

SO ORDERED.

## REPORT AND RECOMMENDATION

E. THOMAS BOYLE, United States Magistrate Judge.

TO THE HONORABLE ROSLYNN R. MAUSKOPF, UNITED STATES DISTRICT JUDGE:

Before the Court is the motion of the defendants, the County of Nassau (the "County"), Thomas Suozzi ("Suozzi"), the Nassau County Civil Service Commission (the "CSC"), John Senko ("Senko"), James Demos ("Demos"), David Gugerty ("Gugerty"), Anthony Cancellieri ("Cancellieri"), John Donnelly ("Donnelly"), the Nassau County Office of Housing and Intergovernmental Affairs ("OHIA"), Peter Sylver ("Sylver"), Bruce Nyman ("Nyman") and Patricia Bourne ("Bourne") (collectively referred to as "defendants"), for summary judgment, pursuant to Federal Rule of Civil Procedure 56. For the following reasons, I recommend that the defendants' motion be granted in part and denied in part.

### *FACTS*

I. *Procedural History*

Plaintiffs, Thomas Williams ("Williams") and Robin Pellegrini ("Pellegrini") (collectively referred to as "plaintiffs"), commenced the instant civil rights action on December 18, 2003, asserting numerous causes of action against the County of Nassau, the CSC and OHIA, as well as certain individual defendants in both their official and individual capacities.[1] Plaintiffs amended their Complaint on February 15, 2004.

---

1. By stipulation and voluntary dismissal, plaintiffs agreed to discontinue the within action against defendants Robert Schoelle, Jr., Carol Kramer, Marguerite Costello and

By Report and Recommendation dated March 15, 2005, the undersigned recommended that several causes of action be dismissed. Those recommendations were adopted by Judge Feuerstein on March 31, 2005.[2] Accordingly, the remaining causes of action are as follows: (1) plaintiffs' causes of action alleging First and Fourteenth Amendment violations pursuant to 42 U.S.C. § 1983 ("Section 1983") (second and third causes of action); (2) Williams' conspiracy claim pursuant to 42 U.S.C. § 1983 (second cause of action); (3) Pellegrini's cause of action alleging race and color discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") (first cause of action); (4) Pellegrini's cause of action alleging age discrimination pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 623 ("ADEA") (fourth cause of action); and (5) plaintiffs' claims under New York State Civil Service Law § 75–b (sixth cause of action).[3]

## II. *Plaintiff Williams*

Plaintiff Williams is the former Executive Director of the Nassau County Civil Service Commission. (Def. R. 56.1 Statement ("Def. R. 56.1") ¶ 3; Pl. R. 56.1 Statement ("Pl. R. 56.1") ¶ 3.) Williams was appointed to that position by defendants Senko, Demos and Gugerty who, at the time, served as the Commissioners of the CSC. (*Id.*) Williams began his appointment on or about December 17, 2002. (*Id.*)

Williams' role as Executive Director was to advise the CSC regarding civil service

requirements, implement "the policies made by the three commissioners ... assure that those policies were enforced and put into operation, and to handle [the] day-to-day operations of the commission staff." (Def. R. 56.1 ¶ 4; Pl. R. 56.1 ¶ 4; Williams Dep. 65.) In this position, Williams reported to the Commissioners, Senko, Demos and Gugerty. (Williams Dep. 66.) Although the CSC is the final decision maker with respect to civil service transactions for all of the municipal agencies within its jurisdiction, it relies on the guidance, advice and information reporting provided by its Executive Director. (Def. R. 56.1 ¶ 5; Pl. R. 56.1 ¶ 5.)

### A. *Complaints Concerning Williams' Conduct as Executive Director of the CSC*

During mid-late 2003, in his capacity as Deputy County Executive ("DCE"), defendant Cancellieri began receiving complaints about Williams and the CSC generally from various County agencies and departments. (Def. R. 56.1 ¶ 10; Pl. R. 56.1 ¶ 10.) Defendant Suozzi, as County Executive, also received complaints concerning Williams' directorship of the CSC. (Def. R. 56.1 ¶¶ 27–29; Pl. R. 56.1 ¶¶ 27–29.)

#### 1. *The Assessment Review Commission*

On January 31, 2003, Glen Borin ("Borin"), then Chair of the Nassau County Assessment Review Commission ("ARC"), emailed Cancellieri, stating that "[m]ovement on Civil Service Commission actions have come to a stop ... We have been doing well on recruitment ... But we will

---

Charles Fowler. (Def. R. 56.1 Statement ¶ 66; Pl. R. 56.1 Statement ¶ 66.)

2. This action was subsequently reassigned to Judge Mauskopf on December 26, 2007.

3. The parties appear to dispute which claims actually remain in this action. After review-

ing the Amended Complaint and the decision previously rendered with respect to the defendants' motion to dismiss, the undersigned finds the foregoing causes of action to be remaining in this action.

have to stop recruiting and risk losing candidates who have accepted offers or expressed interest." (Def. R. 56.1 ¶ 7; Pl. R. 56.1 ¶ 7; Def. Ex. G.) On August 13, 2003, Borin again emailed Cancellieri, as well as Arthur Gianelli ("Gianelli"), the DCE for the Management, Budget and Finance Department, stating that the ARC was losing qualified candidates because employee applications were not being processed timely. (Def. R. 56.1 ¶ 11; Pl. R. 56.1 ¶ 11; Def. Ex. L.) Borin further stated that the ARC "needs decisions on these issues or [it] will lose more of the candidates and develop a poor reputation in the appraisal community, which will frustrate future recruiting." (Def. Ex. L.) By email to Cancellieri dated August 25, 2003, and in response to an email from Williams attributing the loss of a particular candidate to the negligence of the ARC, (Pl. Ex. K), Borin directly blamed Williams for the delay in processing employee applications for the ARC, stating that "ARC did not drop the ball ... Tom Williams punctured it." (Def. Ex. M.) Borin further stated that "Williams [was] the cause of the delays which [made] it hard to recruit competitively for the best talent. (*Id.*)

### 2. *The Information Technology Department*

Similarly, by email dated May 20, 2003, Craig Love ("Love"), Director of the County Information Technology Department ("IT"), requested that Williams "expedite the approval process of the pending applications for Clerk I Seasonal positions in [Williams'] office since May 3rd." (Def. R. 56.1 ¶ 8; Pl. R. 56.1 ¶ 8; Def. Ex. H.) Love stated that "[t]here appear[ed] to be a misunderstanding by certain staff that the applications are on hold until the outcome

of [the] seasonal duration appeal [was] determined," which he stated was incorrect. (Def. R. 56.1 ¶ 8; Pl. R. 56.1 ¶ 8; Def. Ex. H.) Love further stated that the Clerk I Seasonal positions were "critical to the overall success of our strategic initiatives." (Def. Ex. H.) Two days later, on May 22, 2003, Love emailed defendant Suozzi, requesting that he telephone Williams regarding the Clerk I Seasonal positions and stating that he had already called Williams and written him twice. (Def. R. 56.1 ¶ 9; Pl. R. 56.1 ¶ 9; Def. Ex. I.) Love informed Suozzi that the delay in approving the Clerk I Seasonal applications was "causing operational issues" as well as "affecting real people who are waiting to start and in some cases are out of a job." (Def. Ex. I.)

### 3. *The Management, Budget and Finance Department*

By email dated June 30, 2003, Gianelli, the DCE for the Nassau County Management, Budget and Finance Department, emailed Cancellieri and Suozzi, advising them that Williams had spoken out at a Legislative hearing held that day concerning issues relating to the Office of Emergency Management ("OEM"). (Pl. Ex. CC.) Williams had not been present for certain earlier testimony provided at the Legislative hearing by defendant Donnelly, the Director of Human Resources for the County, and Liz Botwin of the County Attorney's Office concerning the approval of titles in the OEM. (Pl. Ex. CC; Def. Reply Ex. C.) Gianelli informed Cancellieri and Suozzi that "Williams proceed[ed] to declare the prior testimony from members of the administration—testimony that he did not hear—'wrong,' among other descriptors" and "attempted to put his [own] version forward." [4] (Pl. Ex. CC.)

---

4. Specifically, the transcript from the Legislative hearing reflects that Williams stated:

I was coming by her [sic] today to visit with some of my friends when I was informed there had been some questions concerning Civil Service regulations and the Office of

Emergency Management. I was also informed of some of the answers which I do

Gianelli went on to state that the County "cannot have someone with no loyalty whatsoever to this administration in a position with this much authority." (Pl. Ex. CC.) Gianelli stated that he felt that Williams "undermined [the] administration ... in the way he conducted himself, and he did so over a topic of importance the Office of Emergency Management." (Pl. Ex. CC.) Gianelli further stated that even if Williams was correct in what he stated to the Legislature, which Gianelli did not know if he was, "there were any number of ways to have helped put together the 'right' response without a public effort to embarrass members of [the] administration." (Pl. Ex. CC.) Gianelli concluded his email by stating that "Tom Williams is not just on a different team ... he's playing a different game." (Pl. Ex. CC.)

In response to Gianelli's email, Cancellieri advised Suozzi via email on July 2, 2003 that he would speak to Williams but that Williams "really doesn't get it and will cause us more trouble down the road." (Cancellieri Dep. 105–06; Pl. Ex. CC.) By email dated July 2, 2003, Suozzi inquired of Cancellieri as to the "process to release" Williams and asked whether the County needed the Commissioners to do so. (Cancellieri Dep. 117; Suozzi Dep. 110–11; Pl. Ex. CC.) Cancellieri responded by email dated July 7, 2003, advising Suozzi that he "asked Liz [Botwin] to do some quiet research."[5] (Pl. Ex. CC.)

### 4. *The Village of Garden City*

During the Summer of 2003, the Village Administrator for Garden City, Robert Schoelle, Jr. ("Schoelle"), informed Cancellieri that the Village was having difficulties filling a position for Director of Recreation, which is a civil service position. (Def. R. 56.1 ¶ 14; Pl. R. 56.1 ¶ 14.) Thereafter, by letter dated November 7, 2003, Schoelle sought Cancellieri's assistance "in helping the Village of Garden City improve relations with the Nassau County Civil Service Commission," stating that he had recently "detected" that the relationship between the two entities was "showing signs of deterioration." (Def. R. 56.1 ¶ 15; Pl. R. 56.1 ¶ 15; Def. Ex. T.) Schoelle requested any suggestions Cancellieri might have "to effect improvements." (Def. Ex. T.)

### 5. *The Council of School Superintendents and BOCES*

By letter dated October 2, 2003, Charles Fowler ("Fowler"), then President of the Nassau County Council of School Superintendents, notified defendant Suozzi that his organization was experiencing difficulties with the CSC under Williams' directorship. (Def. R. 56.1 ¶ 27; Pl. R. 56.1 ¶ 27; Def. Ex. S.) In his letter, Fowler identified an "apparent conflict between the State and the County regarding Nassau County school districts' authority to employ persons from Civil Service lists who are awaiting fingerprint clearance."

---

not believe were entirely accurate and I wanted to make myself available.
&ast; &ast; &ast;
What I was told was that the titles for the various individuals in the Office of Emergency Management have to await approval of Albany and there were questions as to whether they could be appointed before Albany approved. That's not accurate.
The titles have been approved by the Nassau County Civil Service Commission. The

titles are approved and they can be filled immediately upon that.
(Def. Reply Ex. C.)

**5.** Cancellieri testified at his deposition that the email should have stated that he asked Liz Botwin to do some "quick" research, not "quiet" and that the use of the word "quiet" was a typographical error. (Cancellieri Dep. 117–18.)

(Def. Ex. S.) Fowler stated that New York State law permits such individuals to begin employment while awaiting the results of their fingerprint submission but that due to a ruling instituted by Williams,[6] that opportunity was not available to school districts in Nassau County. (*Id.*) Fowler advised Suozzi that "the working relationship with the [CSC], which was very positive under former Executive Director Karl Kampe, has been negatively impacted by the events associated with this issue." (*Id.*) Fowler further advised Suozzi that "[t]he school personnel administrators of the County, who work directly on a daily basis with the Civil Service office, feel that they should discontinue their long-standing practice of meeting regularly with the Executive Director, as Mr. Williams has shown little or no interest in developing a positive working relationship." (*Id.*)

Similarly, by letter dated November 5, 2003, then Executive Director of Human Resources of Nassau County BOCES, Marguerite Costello ("Costello"), notified Suozzi of her "concerns" regarding Williams. (Def. R. 56.1 ¶ 28; Pl. R. 56.1 ¶ 28; Def. Ex. R.) Specifically, Costello stated that Williams had "obstructed the hiring process for Civil Service employees, and . . . [had] been rude and condescending to top leaders of [her] agency," which resulted in BOCES' ability to provide services to the County's children having been "compromised." (Def. Ex. R; Costello Dep. 41–44.)

### 6. *The Planning Department*

On October 8, 2003, Patricia Bourne, the Director of Planning, sent a "confidential memo" to defendants Sylver, Cancellieri and Donnelly, stating that she was subjected to "abusive and threatening remarks" by Williams during a telephone conversation that occurred that day. (Def. Ex. P.) Bourne further described Williams' behavior as "erratic" and stated that Williams "was abusive, crude and so completely unprofessional on the telephone that I was left speechless." (*Id.*) In addition, Bourne stated that this was not the first time that Williams had "behaved erratically" toward the Planning Department. (*Id.*)

### 7. *The Treasury Department*

On October 21, 2003, former Nassau County Treasurer Henry Dachowitz ("Dachowitz") sent an email to Cancellieri, Gianelli and Donnelly entitled "Harassment by Civil Service/Tom Williams." (Def. Ex. Q.) In his email Dachowitz complained that Williams was "dictating" how Dachowitz was to use his staff. (Def. R. 56.1 ¶ 13; Pl. R. 56.1 ¶ 13; Def. Ex. Q.) Dachowitz further complained that Williams was engaging in "personal attacks and vendettas" against him. (Def. Ex. Q.)

### 8. *The Village of Rockville Centre*

By letter dated November 10, 2003, Carol Kramer ("Kramer"), Deputy Clerk Treasurer for the Village of Rockville Centre, expressed concerns to Suozzi regarding how Civil Service matters were being handled by Williams.[7] (Def. R. 56.1 ¶ 29; Pl. R. 56.1 ¶ 29.) Kramer testified at her deposition that Rockville Centre was concerned about its communications with Williams and felt that the CSC was not "working with the Village." (Kramer Dep. 58, 68.) Specifically, Kramer testified that during her one interaction with Williams,

---

**6.** Williams testified at his deposition that the ruling at issue was instituted by the Commissioners, not himself. (Williams Dep. 130–32.) Commissioner Senko testified similarly at his deposition. (Senko Dep. 194, 199.)

**7.** Kramer testified at her deposition that the Village Administrator, Ronald Wasson, actually prepared this letter on Kramer's letterhead and then asked her to sign it. (Kramer Dep. 24–25, 49–54.) Kramer did not object to signing the letter or to the contents of it. (Kramer Dep. 25.)

which took place in August 2003, she felt that "he was attacking [her] for something that [she] had no control over." (Kramer Dep. 59, 62.) Kramer described Williams as "very brusque in his conversation" and stated that he was not understanding. (Kramer Dep. 59.) Kramer further testified that she felt that the way Williams addressed her was "not the way you speak to a village or a person in the village." (Kramer Dep. 59.)

### B. Williams' Reports of Misconduct by County Agencies and Employees

During his tenure as Executive Director, Williams reported to the CSC, as well as to defendant Cancellieri, that County employees in Planning, OHIA and the Treasury Department were working out of title. (Def. R. 56.1 ¶ 43–44; Pl. R. 56.1 ¶ 43–44; Williams Dep. 215–17.) The CSC thereafter decertified the payroll for a number of County employees. (Id.)

#### 1. Planning

In April 2003, an issue arose with respect to the status of several provisional employees[8] in Planning. (Williams Dep. 164–65.) The issue concerned the placement order of individuals on the Planner I and Planner III exams that were certified on April 16, 2003. (Williams Dep. 185.) Specifically, five provisional employees had either failed the placement exam or were "too far down on the list to be able to be reached and be appointed." (Williams Dep. 188.) Shortly thereafter, Williams met with the Director of Planning, defendant Bourne, concerning this issue. (Def. R. 56.1 ¶ 19; Pl. R. 56.1 ¶ 19.) During this meeting, Williams and his staff provided instructions to Bourne regarding the nec-

essary paperwork to resolve the provisional employee problems. (Id.) Williams and his staff continued to interact with Planning subsequent to this meeting in an effort to assist it with its employee problems before the 60–day period for resolving its personnel issues expired.[9] (Williams Dep. 196–97, 200–01, 206–08.)

In May 2003, Williams brought the problems Planning was experiencing to the attention of the Commissioners. (Williams Dep. 202–03.) The Commissioners did not direct Williams to take any specific action other than to work with Planning to resolve the problem. (Williams Dep. 203–04.)

In June 2003, Planning's 60–day placement period expired. (Williams Dep. 209–10.) At that time, one of the provisional employees was appointed to a full-time position. (Williams Dep. 210.) The other four positions were not filled. (Williams Dep. 210.) Williams informed Planning that it needed to resolve the issue immediately and that the provisional employees would not continue to be employed after June 16, 2003. (Williams Dep. 210.) In July 2003, Bourne advised Williams that the remaining provisional employees were being terminated from Planning and appointed to positions in OHIA until she could obtain approval to reinstate them in Planning. (Williams Dep. 212–13.) Williams received paperwork verifying that this was in fact done and considered the issue resolved. (Williams Dep. 213, 217.)

In late August or early September 2003, Williams learned that the provisional employees who Bourne had advised would be

---

**8.** "A provisional employee is one who is hired in a competitive position for which there is no existing list of individuals who have taken and passed a [Civil Service] test." (Decl. of Thomas A Williams, dated Nov. 27, 2007 ("Williams Decl."), ¶ 8.)

**9.** At the end of the 60–day period, any provisional employees that were not appointed to full-time positions would be terminated. (Williams Dep. 197.)

transferred to OHIA were still working in Planning. (Williams Dep. 214.) On September 18, 2003, Williams met with Cancellieri and informed him that a number of employees who were on OHIA's payroll were actually performing work for Planning in positions to which they were not entitled. (Williams Dep. 215–17.) Williams further advised Cancellieri that the arrangement could possibly constitute a misuse of federal funds if individuals were being paid out of OHIA funds but not actually performing work for OHIA. (Williams Dep. 217–18.) A couple of days later, Cancellieri advised Williams that he assigned defendant Donnelly, the Director of Human Resources, to handle the issue with Planning. (Williams Dep. 220–21.)

As of October 2003, no action was taken by Planning to correct the issues Williams raised with Cancellieri on September 18, 2003. (Williams Dep. 248–49.) Williams again brought the issue to the attention of the Commissioners on October 28, 2003. (Williams Dep. 249.) On October 31, 2003, the CSC withdrew the payroll certification for two former Planners. (Def. R. 56.1 ¶ 21; Pl. R. 56.1 ¶ 21.)

### 2. OHIA

The CSC also came to learn that approximately five employees in OHIA were working out of title. (Gugerty Dep. 300.) By resolution dated October 28, 2003, the CSC voted and instructed Williams to notify the five employees that payroll certification with respect to those employees would be withdrawn in the future.[10] (Senko 155–59; Gugerty Dep. 300; Pl. Ex. Q.) Williams thereafter sent an inter-departmental memorandum, dated October 31,

2003, to defendant Sylver, notifying him that the five employees "must be terminated immediately" and that payroll certification for each of them would be withdrawn, effective October 31, 2003. (Pl. Ex. R.)

### 3. The Treasury Department

With respect to the Treasury Department, there were three employees who were working out of title while Williams was the Executive Director of the CSC. (Williams Dep. 223.) Specifically, two of the employees were being given tasks to perform that were not appropriate to their job titles and the third, Angela DiMascio ("DiMascio"), was a provisional employee who failed the civil service exam for the placement she was seeking. (Williams Dep. 223–28.)

With respect to DiMascio, Williams advised Dachowitz, the Treasurer, that he needed to fill the position DiMascio was provisionally performing but that he could not fill it with DiMascio since she had failed the placement exam. (Williams Dep. 234–35.) Williams was thereafter informed that although Dachowitz had interviewed three eligible candidates for the position, Dachowitz had discouraged all three from accepting the position.[11] (Williams Dep. 236–38; Pl. Ex. AA.) Williams presented this information to the Commissioners who passed a resolution stating that Dachowitz would not be permitted to reappoint DiMascio to the provisional position she had previously held. (Williams Dep. 238–39.) Upon learning that Dachowitz was continuing to employ DiMascio out of title, Williams advised Dachowitz on more than one occasion that his

---

**10.** By that same resolution, the Commissioners also voted to withdraw the payroll certification for another employee, Jason Plaskowitz, who was employed as a Clerk Seasonal in the Office of Management and Budget, but who was actually performing work for the IT Department. (Pl. Ex. Q.)

**11.** By inter-departmental memorandum dated April 23, 2003, Dachowitz informed Williams that all three eligible candidates had declined the position and further requested that he be permitted to reappoint DiMascio to the position. (Pl. Ex. W.)

actions were "illegal" and a "flagrant violation of Civil Service Law." (Williams Dep. 243; Pl. Ex. L; Pl. Ex. V.) On July 22, 2003, the Commissioners voted to withdraw the payroll certification for DiMascio. (Pl. Ex. V.)

On October 28, 2003, Williams advised the Commissioners that the issues arising in the Treasury Department had still not been corrected. (Williams Dep. 248–49.) The Commissioners thereafter withdrew the payroll certification for the three Treasury employees. (Williams Dep. 249.)

An investigation into Williams' allegations was conducted by the Office of the Nassau County Commissioner of Investigations. (Def. Ex. MM.) In a report dated January 19, 2004, the Commissioner of Investigations found that "federal grant money was *not* used to fund Planning Department salaries" as Williams had alleged to Cancellieri in September 2003.[12] (Def. Ex. MM (emphasis in original).) Nor did the Commissioner of Investigations find any wrongdoing on the part of Planning with respect to the assignment of proper titles to its employees. (Def. Ex. MM.) Rather, the Commissioner of Investigations found that "[w]hile errors occurred in terms of assigning proper titles to Planning Department employees and completing required paperwork, there was no attempt to circumvent the Civil Service Commission or its requirements." (Def. Ex. MM.) The Commissioner of Investigations attributed the Planning Department's errors to "a lack of understanding of Civil Service requirements and procedures, and from a lack of assistance from Civil Service." (Def. Ex. MM.)

Prior to his termination, Williams never notified any media outlets regarding his concerns that the County had engaged in improper or illegal employment actions. (Def. R. 56.1 ¶ 46; Pl. R. 56.1 ¶ 46.) Nor did Williams notify the State Civil Service Commissioner or any law enforcement agencies of the illegal employment actions he alleges to have occurred. (Def. R. 56.1 ¶ 47; Pl. R. 56.1 ¶ 47.) Following Williams' termination, the CSC rescinded some, but not all, of the payroll decertifications. (Gugerty Dep. 336–37; Pl. Ex. BB.)

### C. Williams' Termination

In late October or early November 2003, Cancellieri met with two of the three Commissioners–Demos and Gugerty[13]-as well as defendant Donnelly to discuss the alleged problems that the various municipal agencies and County departments were having with Williams. (Cancellieri Dep. 188–89, 207, 211; Donnelly Dep. 152–54.) On November 10, 2003, a meeting was held between Williams and the CSC Commissioners. (Def. R. 56.1 ¶ 41; Pl. R. 56.1 ¶ 41.) Williams was informed that his employment with the CSC was being terminated and was provided a memo containing the rationale for his termination, as well as four letters from various County agencies containing complaints about Williams, upon which the Commissioners' based their decision to terminate. (Williams Dep. 413–16; Pl. Ex. Z.) The Commissioners advised Williams of the reasons for his termination and passed a resolution terminating his employment.[14] (Williams Dep. 414–15.)

---

**12.** The Commissioner of Investigations found that the Planning employees' salaries were paid out of County "general funds under the Housing 85 category," which were subsequently "reimbursed by the Office of Planning through journal entries." (Def. Ex. MM.)

**13.** Commissioner Senko was on vacation at this time. (Senko Dep. 42.)

**14.** The Commissioners voted 2 to 1 in favor of terminating Williams, with Senko voting against termination. (Senko Dep. 53–57; Gugerty Dep. 302.)

### III. *Plaintiff Pellegrini*

Plaintiff Pellegrini is the former Acting Director of the Nassau County Office of Housing and Intergovernmental Affairs, which oversees the administration of millions of dollars in federal funding for block grant spending for housing and other initiatives to assist moderate and low income persons. (Def. R. 56.1 ¶ 50–51; Pl. R. 56.1 ¶ 50–51.) Pellegrini was appointed to that position in 2002 when defendant Suozzi took office as County Executive. (Def. R. 56.1 ¶ 51; Pl. R. 56.1 ¶ 51.) Prior to this appointment, Pellegrini had been employed with OHIA since 1993, as both a Community Development Representative and the Community Development Director. (Pellegrini Dep. 13, 23–24.)

In March 2002, defendant Sylver was appointed Deputy County Executive for the County's "Economic Development vertical," which included OHIA and Planning. (Def. R. 56.1 ¶ 52; Pl. R. 56.1 ¶ 52.) At the time of Sylver's appointment, Pellegrini remained in her position of Acting Director of OHIA as a "holdover" from the previous administration. (*Id.*) Pellegrini was the only person in OHIA at that time who possessed certain important institutional knowledge concerning the operation of the agency. (Def. R. 56.1 ¶ 53; Pl. R. 56.1 ¶ 53.)

Shortly after Sylver began his appointment, Pellegrini attended a meeting with Sylver, a land development contractor, Chris Daly ("Daly"), and OHIA's outside counsel, Robert Benrubi ("Benrubi"), during which Sylver requested that Daly hire his brother in return for financial help that would be provided to Daly's company through the HOME program. (Def. R. 56.1 ¶ 54; Pl. R. 56.1 ¶ 54; Pellegrini Dep. 117–21.) Pellegrini found Sylver's request to be improper and reported it to defen-

dant Nyman. (Def. R. 56.1 ¶ 54; Pl. R. 56.1 ¶ 54.) Pellegrini further reported the incident to the then Chief Deputy County Executive, William Cunningham. (Def. R. 56.1 ¶ 55; Pl. R. 56.1 ¶ 55.)

In April 2002, Pellegrini learned that Michael Levine ("Levine"), a planner from North Hempstead, would begin working at OHIA as a Community Development Representative. (Def. R. 56.1 ¶ 55; Pl. R. 56.1 ¶ 56.) However, shortly after commencing work at OHIA—and being placed on OHIA's payroll—Levine began working in Planning instead.[15] (*Id.*) Pellegrini thereafter approached Sylver to protest Levine's salary being paid out of OHIA's budget when he was not actually working on the community block grant programs, asserting that such a practice was contrary to the regulations of the United States Department of Housing and Urban Development ("HUD"). (Def. R. 56.1 ¶ 57; Pl. R. 56.1 ¶ 57.) Sylver told Pellegrini to "[M]ind [her] own business." (*Id.*; Pellegrini Dep. 93–94.) Pellegrini never voiced her complaints concerning Levine's salary arrangement to defendant Suozzi. (Def. R. 56.1 ¶ 58; Pl. R. 56.1 ¶ 58.)

During this same time, Pellegrini also believed that the salary of the newly appointed Director of Real Estate was being improperly paid out of HUD monies. (Def. R. 56.1 ¶ 59; Pl. R. 56.1 ¶ 59.) Pellegrini did not report this to Sylver, but rather advised Benrubi of her suspicions with the expectation that he would report it to Suozzi. (Def. R. 56.1 ¶¶ 59–60; Pl. R. 56.1 ¶¶ 59–60.) In addition, Pellegrini felt that several other persons, including Sylver, his secretary and his Chief of Staff, were being paid improperly out of HUD monies. (Def. R. 56.1 ¶ 61; Pl. R. 56.1 ¶ 61.) Pellegrini reported her allegations

---

**15.** Levine was also one of the employees that Williams advised Planning was working out

of title. (Bourne Dep. 240–41, 246–47.)

to Benrubi and another outside attorney for the County, Dan Deegan ("Deegan"), as well as defendant Nyman, and believed that Benrubi was relaying the information to Suozzi. (*Id.;* Pellegrini Dep. 113–14.) Pellegrini never spoke to Sylver about the source of his salary or the salaries of his secretary and Chief of Staff. (Pellegrini Dep. 114.)

Another issue that concerned Pellegrini was Sylver's alleged issuance of contracts without the benefit of requests for proposals. (Def. R. 56.1 ¶ 62; Pl. R. 56.1 ¶ 62.) Pellegrini reported her concerns to Benrubi and Deegan. (*Id.*)

In May 20002, Sylver hired a consultant, Don Schatz ("Schatz"), to oversee Pellegrini. (Pellegrini Dep. 131–32.) In his capacity as a consultant, Schatz visited the OHIA offices once per week and observed Pellegrini performing her job. (*Id.* 132–33.) Schatz also asked Pellegrini questions pertaining to how she performed her job, as well as her daily routine, and took notes with respect to her position. (*Id.*) This arrangement lasted for approximately five months. (*Id.* 132.)

On September 20, 2002, Sylver called Pellegrini to his office and terminated her employment. (Def. R. 56.1 ¶ 65; Pl. R. 56.1 ¶ 65.) Thereafter, Pellegrini met with John Donnelly for the purpose of possibly obtaining another position with the County. (Pellegrini Dep. 191–92, 194; Donnelly Dep. 25–26.) During this meeting, Pellegrini advised Donnelly that she had been terminated from her position at OHIA and that she believed her termination was the result of information that she possessed that reflected negatively on Sylver. (Pellegrini Dep. 194–95; Donnelly Dep. 27–29.) Pellegrini was not ultimately hired for another position with the County. (Pellegrini Dep. 195, 201; Donnelly Dep. 30–31.)

## DISCUSSION

### I. *Legal Standard*

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to establish the lack of any factual issues. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The very language of this standard reveals that an otherwise properly supported motion for summary judgment will not be defeated because of the mere existence of some alleged factual dispute between the parties. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rather, the requirement is that there be no "genuine issue of material fact." *Id.* at 248, 106 S.Ct. 2505.

The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When the moving party· has carried its burden, the party opposing summary judgment must do more than simply show that "there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. Under Rule 56(e), the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but ... must set forth specific facts showing there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

When considering a motion for summary judgment, the district court "must also be 'mindful of the underlying standards and burdens of proof' ... because the evidentiary burdens that the respective parties will bear at trial guide district courts in

their determination of summary judgment motions." *SEC v. Meltzer*, 440 F.Supp.2d 179, 187 (E.D.N.Y.2006) (quoting *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir.1988) (internal citations omitted). "Where the non-moving party would bear the ultimate burden of proof on an issue at trial, the burden on the moving party is satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim." *Meltzer*, 440 F.Supp.2d at 187.

Summary judgment should not be regarded as a procedural shortcut, but rather as an integral part of the Federal Rules of Civil Procedure, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548. Rule 56 must be "construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those persons "opposing such claims and defenses to demonstrate, ... prior to trial, that the claims and defenses have no factual basis." *Id.* By its terms, Rule 56 does not require that a trial judge make any findings of fact. *See Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. The only inquiry to be performed is the determination of whether there is a need for trial. *See id.* The court's principal analysis on a motion for summary judgment is to ascertain whether there are any "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.*

II. *Plaintiffs' First Amendment Retaliation Claims*

▇ To establish a First Amendment retaliation claim under Section 1983, a public employee must demonstrate the following: (1) the speech at issue was protected; (2) he suffered an adverse employment action; and (3) "the speech at issue was a substantial or motivating factor in the adverse employment action." *Benvenisti v. City of New York*, No. 04 Civ. 3166, 2006 WL 2777274, at *7, 2006 U.S. Dist. LEXIS 73373, at *21–22 (S.D.N.Y. Sept. 23, 2006) (citing cases); *see also Healy v. City of New York*, No. 04 Civ. 7344, 2006 WL 3457702, at *4, 2006 U.S. Dist. LEXIS 86344, at *11 (S.D.N.Y. Nov. 22, 2006) (citing cases).

▇ In determining whether a public employee's speech is protected, courts must engage in a two-part inquiry. *See Healy*, 2006 WL 3457702, at *4–5, 2006 U.S. Dist. LEXIS 86344, at *12 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)). First, a court must determine "whether the employee spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418, 126 S.Ct. 1951 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Speech is considered protected where it pertains to a "matter of political, social or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). However, "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment falls outside the realm of constitutional protection." *Benvenisti*, 2006 WL 2777274, at *10, 2006 U.S. Dist. LEXIS 73373, at *32 (internal quotation marks and citations omitted). Moreover, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes," *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951, and "the First Amendment does not protect the employee's speech *from discipline* or retaliation by the employer." *Weintraub v. Bd. of Educ.*, 489 F.Supp.2d 209, 219 (E.D.N.Y.2007). "The inquiry into the

protected status of speech is one of law, not fact." *Benvenisti*, 2006 WL 2777274, at *7, 2006 U.S. Dist. LEXIS 73373, at *24 (quoting *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. 1684); *see also Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir.1999) ("Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide....").

 If the answer to the first part of the inquiry is no and the employee's speech is found to be of a private matter rather than a public one, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418, 126 S.Ct. 1951 (citing *Connick*, 461 U.S. at 147, 103 S.Ct. 1684). However, if the answer is yes, the court must "move to the second part of the test, questioning 'whether the relevant government entity has an adequate justification for treating the employee differently from any other member of the general public.'" *Healy*, 2006 WL 3457702, at *4, 2006 U.S. Dist. LEXIS 86344, at *12 (quoting *Garcetti*, 547 U.S. at 418, 126 S.Ct. 1951). This requires the court to arrive "at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731 (commonly referred to as the "*Pickering* balancing test"); *see also McEvoy v. Spencer*, 124 F.3d 92, 98 (2d Cir. 1997) (holding that the ultimate question is whether the employee's right to speak is outweighed by the public employer's interest in the effective operation of the workplace). This, too, is an issue of law for the court to decide. *See Lewis*, 165 F.3d at 164 ("[I]t is the court's task to apply the [balancing test] to the facts.") (alteration in original); *Mataraza v. Newburgh Enlarged City Sch. Dist.*, 294 F.Supp.2d 483, 487 (S.D.N.Y.2003) ("It is the Court, not

the jury, that performs the *Pickering* balancing test.").

 In conducting the *Pickering* balancing test, "a court must consider whether the statement sought to be protected 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships ... or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Lewis*, 165 F.3d at 162 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)); *see also Rookard v. Health and Hosps. Corp.*, 710 F.2d 41, 46 (2d Cir.1983) ("[A] court should consider whether the speech impaired the employee's ability to perform his duties, disrupted working relationships requiring personal loyalty and confidence, or otherwise impeded the regular operation of the employing agency."). Additionally, the "manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891; *see also Lewis*, 165 F.3d at 162. The government bears the burden of demonstrating that the challenged speech threatens to interfere with its operations. *See Lewis*, 165 F.3d at 162. However, the government is only required to show a "likely interference with its operations, ... not an actual disruption." *Id.* at 163 (internal quotation marks and citations omitted); *see also Mataraza*, 294 F.Supp.2d at 488 (rejecting plaintiff's argument that the defendant must demonstrate that his speech actually disrupted the workplace).

 Finally, under the *Pickering* balancing test, speech charging unlawful, fraudulent, or corrupt conduct carries great weight. *See Rookard*, 710 F.2d at 46; *Benvenisti*, 2006 WL 2777274, at *10, 2006 U.S. Dist. LEXIS 73373, at *31 ("Allegations of public corruption or wrongdo-

ing are almost always matters of public concern."). "An employee's charge of unlawful conduct is given far greater weight than is a complaint as to the fairness of internal office operations." *Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 140 (2d Cir.1999) (citing *Connick*, 461 U.S. at 148–49, 103 S.Ct. 1684) (additional citations omitted). "A public employer cannot, with impunity, fire an employee who 'blew the whistle' on other employees' violations of law on the ground that those disclosures impaired office morale." *Dangler*, 193 F.3d at 140 (citing *Frank v. Relin*, 1 F.3d 1317, 1331 (2d Cir.1993)).

### A. *Williams*

Williams alleges a First Amendment retaliation claim against all of the remaining defendants. Defendants assert that they are entitled to summary judgment on this claim because Williams' speech was made pursuant to his professional responsibilities, and therefore is not protected under the First Amendment. Alternatively, defendants argue that even if Williams did engage in protected speech, and was subsequently terminated as a result of that speech, defendants are entitled to qualified immunity.

█ It is undisputed that Williams' responsibilities as Executive Director of the CSC included enforcing the rules and regulations governing civil service employees and investigating any suspected wrongdoing. *See* N.Y. Civ. Serv. Law § 6 (incorporated by reference in the Nassau County charter). Accordingly, much of Williams' allegations of out of title work by civil service employees—specifically, those allegations made to the Commissioners concerning Planning, OHIA and the Treasury Department—were made pursuant to his official duties as Executive Director and undeserving of First Amendment protection. *See Garcetti*, 547 U.S. at 421, 126

S.Ct. 1951. However, the record in this action also clearly establishes that Williams reported solely to the Commissioners and not to the County Executive or any of his Deputy County Executives. (Williams Dep. 66; Gugerty Dep. 16–17; Cancellieri Dep. 72; Suozzi Dep. 52–53.) The record further establishes that Williams not only informed the Commissioners of his concerns regarding out of title work being performed—which, as stated above, fell within his duties as Executive Director—but that he also reported such information to defendant Cancellieri, to whom he owed no reporting responsibility. (Suozzi Dep. 183 (stating that Cancellieri did not have the authority to terminate Williams.))

Specifically, as discussed above, Williams met with Cancellieri in September 2003 and informed him that a number of employees who were on OHIA's payroll were actually performing out of title work for Planning. (Williams Dep. 215–17.) Williams further advised Cancellieri that the arrangement could constitute a misuse of federal funds if individuals were being paid out of OHIA funds but not actually performing work for OHIA. (Williams Dep. 217–18.)

█ Where a public employee "goes outside of the established institutional channels in order to express a complaint or concern, the employee is speaking as a citizen, and the speech is protected by the First Amendment." *Weintraub*, 489 F.Supp.2d at 219. That is precisely what occurred here. In light of the fact that Williams had no duty to report any concerns he may have had to Cancellieri, his actions in doing so were taken as a private citizen and not as a public employee. As such, the rule established in *Garcetti* does not apply. *See id.* at 220 (holding that plaintiff's complaints to coworkers were not within the scope of his employment

duties and entitled to First Amendment protection).

Having found that Williams' speech was made in his capacity as a private citizen upon a matter of public concern, the Court must next balance Williams' interest in free speech against defendants' interest in the effective operation of the CSC and the County. In effect, Williams' speech alleged that County agencies and employees were engaging in improper, and potentially corrupt or fraudulent, practices. This is clearly a matter of public concern and therefore protected by the First Amendment. *See Dangler,* 193 F.3d at 140 (holding that where plaintiff alleged high-level officials within defendant's corporation of "improper and corrupt behavior ... [t]here can be no question that [her] speech therefore implicated particularly strong First Amendment interests"). As stated above, speech of this nature weighs heavily in favor of the employee when balancing the competing interests. *See Rookard,* 710 F.2d at 46.

Moreover, defendants have not met their burden of establishing that Williams' speech was likely to interfere with its operations. Although the record contains evidence of numerous complaints lodged against Williams by various County agencies and departments, most, if not all, of the actions complained of were actually taken by Williams as a result of an order issued by the Commissioners. (Williams Dep. 66 (confirming that "[a]ll of the implementation of policy ... was to be at the direction of the Civil Service Commissioners"); Suozzi Dep. 98.) The Commissioners themselves testified at their depositions that they were responsible for making the ultimate determinations with respect to civil service policy and that Williams merely carried out their instructions. (Senko Dep. 15; Gugerty Dep. 30–33, 73–74.) Moreover, two of the three Commissioners were unable to specify any

actions by Williams that they found to be improper. (Senko Dep. 27–28; Demos Dep. 113–16, 135–36.) In addition, as plaintiffs point out, the concerns that Williams raised to both the Commissioners and Cancellieri, whether ultimately found to be true or not, were aimed at improving the way the County was run. Accordingly, the defendants' contention that the voicing of such concerns interfered with the effective operation of the County is without merit.

■ Based on the foregoing, I find that Williams engaged in speech protected by the First Amendment. Moreover, it is undisputed that by being terminated Williams suffered an adverse employment action. *See Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) ("Adverse employment actions include discharge...."). I further find that, based on the evidence submitted, sufficient questions of fact exist with respect to whether or not Williams' speech was the motivating factor for his termination, particularly in light of the fact that Williams was terminated less than two months after voicing his concerns to defendant Cancellieri. Such issues of fact preclude a determination of summary judgment. *See id.* ("Summary judgment is precluded where questions regarding an employer's motive predominate in inquiry regarding how important a role the protected speech played in the adverse employment decision.").

Accordingly, I recommend that defendants' motion for summary judgment with respect to Williams' claim of First Amendment retaliation be denied.

### B. *Pellegrini*

As a result of defendants' prior motion to dismiss, Pellegrini's First Amendment retaliation claim remains only against defendants Nassau County and Peter Sylver. As with Williams, defendants assert that

Pellegrini did not engage in protected speech because her statements were made pursuant to her official duties as Acting Director of OHIA and therefore, she does not have a cognizable First Amendment retaliation claim. For reasons similar to those outlined above with respect to Williams, I find defendants' argument lacking.

As Acting Director of OHIA, Pellegrini was responsible for the oversight of millions of dollars in federal funds allocated for community development spending for housing and various other initiatives to assist moderate to low-income persons residing in the County. (Pellegrini Dep. 59–60.) In that capacity, Pellegrini reported directly to Suozzi when she was first appointed in January 2002, and thereafter reported to Sylver when he was appointed DCE for the Economic Development vertical in March 2002. (Pellegrini Dep. 59; Pellegrini Decl. ¶ 10; Suozzi Dep. 33–34.)

It is undisputed that Pellegrini voiced her concerns regarding out of title work being performed by an OHIA employee and Sylver's allegedly improper behavior to Sylver directly, as well as to other County executives, such as defendant Nyman. Such speech would likely be precluded from First Amendment protection under the Supreme Court's ruling in *Garcetti*. However, Pellegrini's deposition is rife with examples wherein Pellegrini went outside of the County structure to complain about what she perceived to be corrupt and fraudulent behavior within OHIA, and particularly on Sylvar's part, on more than one occasion over a period of several months. For example, Pellegrini testified that she voiced concerns to Barbara Scammacca, an in-house human resources employee, (Pellegrini Dep. 90, 94, 139–40), as well as Joe Machiano, who headed the County's Rehab Program, and Cathy Sevchuck, a Mental Development Representative. (Pellegrini Dep. 86–87.) Although

these individuals are or were County employees, it has not been shown that Pellegrini owed any sort of reporting duty to them. Rather, they were Pellegrini's coworkers.

In addition, Pellegrini testified that she also raised numerous concerns with the County's outside economic development counsel, Robert Benrubi and Dan Deegan, neither of whom were County employees. (Pellegrini Dep. 99–101, 111–15, 131, 139.) Finally, Pellegrini also spoke with the former Police Chief of Long Beach, Chief Buscemi, as well as his wife and his daughter, Laura, at their home, informing them of her allegations concerning Sylver and seeking advice as to how she should proceed. (Pellegrini Dep. 120–21, 186, 191.) As with Williams, going "outside of the established institutional channels in order to express a complaint or concern" renders Pellegrini's speech that of a citizen, not a public employee, and such speech is protected by the First Amendment. *Weintraub*, 489 F.Supp.2d at 219. Moreover, even if the reporting of such concerns could be found to be within Pellegrini's employment responsibilities, as defendants contend, there has been no evidence offered from which the court could conclude that Pellegrini was obligated to report such information to coworkers or individuals not employed by the County. *See Weintraub*, 489 F.Supp.2d at 220 (holding that complaints to coworkers constitute protected First Amendment speech).

Furthermore, for the same reasons set forth above, defendants have not met their burden of establishing that Pellegrini's speech was likely to disrupt its operations. As with Williams, Pellegrini was voicing concerns regarding allegedly corrupt and fraudulent practices within OHIA and, more specifically, by her supervisor, Sylver. As stated above, such speech is almost always considered a matter of public

concern and is given great weight when balanced against the government's interests. *See Dangler*, 193 F.3d at 140; *Benvenisti*, 2006 WL 2777274, at *10, 2006 U.S. Dist. LEXIS 73373, at *31. In addition, defendants have failed to offer any evidence as to how Pellegrini's speech interfered with the effective operation of the County. Rather, defendants' argument hinges solely on the issue of whether or not Pellegrini's speech is protected. As a result, defendants failed to even advance an argument for the Court to consider. Accordingly, having found that Pellegrini spoke as a citizen on a matter of public concern and that defendants have failed to demonstrate that the balance under *Pickering* should weight in their favor, I find that Pellegrini's speech was indeed protected under the First Amendment.

Based on the foregoing, I find that Pellegrini has satisfied the first element of a First Amendment retaliation claim. In addition, it is undisputed that Pellegrini suffered an adverse employment action—*i.e.*, her termination—thereby satisfying the second element of her claim. *See Morris*, 196 F.3d at 110. However, as with Williams, I find that, based on the evidence submitted, sufficient questions of fact exist with respect to whether or not Pellegrini's termination was motived by her speech, particularly since Pellegrini's speech and termination all occurred within a period of six months. Such issues of fact accordingly preclude a determination of summary judgment. *See supra* at 287–88; *see also Morris*, 196 F.3d at 110.

Based on the foregoing, I recommend that defendants' motion for summary judgment with respect to Pellegrini's First Amendment retaliation claim be denied.

## C. *Qualified Immunity*

Defendants assert that even if plaintiffs are successful on their First Amendment retaliation claims, the individual defendants are entitled to qualified immunity.[16] Qualified immunity shields government officials from civil liability resulting from the performance of their discretionary functions only where their conduct "did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official[s] to believe that [their] conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir.2003) (citing *Lewis*, 165 F.3d at 166–67). However, "[w]here specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate." *Mandell*, 316 F.3d at 385 (citing cases). Here, retaliatory intent is an element of plaintiffs' First Amendment claims and there is a triable issue of fact with respect to that element—*i.e.*, whether plaintiffs' protected speech was the motivating factor for defendants' decisions to terminate them. Accordingly, "[u]ntil that issue is resolved by a factfinder . . . the retaliation claim[s] against [the individual defendants] cannot be dismissed on qualified immunity grounds." *Id.; see also Morgenstern v. County of Nassau*, No. 04–CV–0058, 2008 WL 4449335, at *18, 2008 U.S. Dist. LEXIS 91746, at *52 (E.D.N.Y. Sept. 29, 2008) (stating that "granting summary judgment based on qualified immunity is improper if genuine issues of material fact exist"); *Davis v. City of New York*, 373 F.Supp.2d 322,

---

**16.** The defense of qualified immunity is unavailable to the County. *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (noting that qualified immunity is unavailable "in an action against a municipality").

338 (S.D.N.Y.2005) ("As there remains a question of fact as to defendant[s'] ... states of mind as to plaintiffs' ... First Amendment claims, the Court cannot grant defendants immunity on these claims as a matter of law."); *Szoke v. Carter*, 974 F.Supp. 360, 369 (S.D.N.Y. 1997) ("Because facts material to this inquiry, namely the factual question behind [defendant's] actions, are in dispute, the Court cannot make a qualified immunity determination at this time.").

### III. *Williams' Section 1983 Conspiracy Claim* [17]

To establish a claim for conspiracy under 42 U.S.C. § 1983, Williams must demonstrate the following: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir.1999) (citing cases). This requires the plaintiff to introduce evidence that "the defendants acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds, to violate his rights." *Blount v. Swiderski*, No. 03–CV–0023, 2006 WL 3314635, at *18, 2006 U.S. Dist. LEXIS 82889, at *55 (E.D.N.Y. Nov. 14, 2006) (quotation omitted). A plaintiff alleging a conspiracy may meet this requirement through either direct or circumstantial evidence. *See Pangburn*, 200 F.3d at 72. "This is not to say, however, that a plaintiff may over-

come a summary judgment motion based simply on general and conclusory allegations." *Blount*, 2006 WL 3314635, at *18, 2006 U.S. Dist. LEXIS 82889, at *55–56.

Here, Williams alleges that defendants Cancellieri and Suozzi "and their designees" conspired with former defendants Fowler, Schoelle, Kramer and Costello [18] to terminate him in retaliation for "speaking out about the illegal and improper actions being taken by [d]efendants." (Williams Decl. ¶ 39; Am. Compl. ¶ 115.) Williams relies on the complaint letters written by Fowler, Schoelle, Kramer and Costello within weeks prior to his termination [19] as evidence of the purported conspiracy. However, the deposition testimony of Fowler, Schoelle, Kramer and Costello unequivocally establishes that none of these individuals wrote their individual letters of complaint with the intention of having Williams terminated.

For example, Fowler specifically testified at his deposition that he did not write his letter for the purpose of having Williams terminated. (Fowler Dep. 93.) Moreover, at the time he wrote his letter, Fowler did not have any understanding, belief or knowledge that his letter might be used as a basis to terminate Williams. (Fowler Dep. 93–94.) In fact, Fowler testified that he did not even learn that his letter had been used in part to terminate Williams until he read so in the Complaint in this matter. (Fowler Dep. 95–96.) Similarly, Schoelle testified that he sent his letter of complaint with the intention

---

**17.** Although plaintiffs make reference to a conspiracy claim on behalf of Pellegrini in their opposition papers, (Pl. Mem. of Law 19), a review of the Amended Complaint demonstrates that a conspiracy claim is only alleged by Williams. (Am. Compl. ¶ 115.) Moreover, on page one of their opposition papers, plaintiffs list the claims remaining in this action. Such claims do not include a conspiracy claim by Pellegrini. (Pl. Mem. of Law 1.)

**18.** As stated *supra*, plaintiffs have voluntarily dismissed the within action against Fowler, Schoelle, Costello and Kramer. *See supra* n. 1.

**19.** Fowler's letter is dated October 2, 2003. Schoelle's, Kramer's and Costello's letters are all dated between November 3, 2003 and November 10, 2003. Williams was terminated on November 10, 2003.

that it be construed as "an overture to be of assistance ... in improving [Garden City's] relationship or perceived relationship with the Civil Service Commission" and that he was surprised to learn that it was "utilized for other purposes," namely Williams' termination. (Schoelle Dep. 86–87.) Although Schoelle testified that he submitted his letter in response to a request from Cancellieri to put in writing certain concerns he had previously raised regarding Williams and the CSC's relationship with Garden City, (Schoelle Dep. 57–67), Schoelle further testified that had he known the purpose for which his letter was going to be used, he would not have written it. (Schoelle Dep. 89.) As with Fowler, Schoelle did not learn that his letter was used as a basis for Williams' termination until he read the Complaint in this action. (Schoelle Dep. 79, 85.)

With respect to Costello, she testified at her deposition that the purpose of her letter was to voice her concerns regarding the relationship between BOCES and the CSC in an effort to improve that relationship. (Costello Dep. 88.) Costello further testified that her letter was not a "complaint" but rather a "concern" and that the issue that had arisen between BOCES and the CSC with respect to fingerprinting "was[ ][not] something that [she] believed could[ ][not] be resolved." (Costello Dep. 90.) Finally, Kramer testified that she did not write her letter herself, but rather she simply signed a letter that was drafted by the Village of Rockville Centre's Administrator, Ronald Wasson. (Kramer Dep. 24–25, 32–33, 69.) In fact, Kramer testified that she did not even read the letter that she signed other than the first and last lines of it, nor did she read that it was addressed to defendant Suozzi. (Kramer Dep. 39, 51.) Kramer was not made aware

of the letter or its contents any time prior to being asked to sign it. (Kramer Dep. 50.) Kramer further testified that it was not her intent to have anyone terminated, but rather she "just wanted [the CSC] to work better with [Rockville Centre] and give [Rockville Centre] more guidance when [it] did have a problem." (Kramer Dep. 46–47.) Moreover, Kramer characterized her letter as "more [of] a request, not a complaint" and testified that had she known that Williams would be terminated in part due to her letter, she would not have signed it. (Kramer Dep. 72, 77.)

Williams has not produced any evidence, apart from speculation and conjecture, to contradict the testimony provided by Fowler, Schoelle, Kramer and Costello at their depositions. Nor has Williams offered even a scintilla of evidence of any agreement between the County defendants and Fowler, Schoelle, Kramer or Costello to work together to secure Williams' termination. As such, I conclude that Williams has failed to demonstrate a "meeting of the minds," an understanding, or any agreement whatsoever on the parts of Fowler, Schoelle, Kramer and Costello to conspire to terminate Williams.

 Having concluded that former defendants Fowler, Schoelle, Kramer and Costello were not part of any alleged conspiracy to violate Williams' rights, the only remaining defendants who are alleged to have engaged in a conspiracy are defendants Cancellieri, Suozzi "and their designees." (Am. Compl. ¶ 115.) Defendants assert that they are entitled to summary judgment on Williams' conspiracy claim on the basis of the intracorporate conspiracy doctrine.[20] Under this doctrine, "the officers, agents, and employees of a single corporate or municipal entity, each acting

20. Williams appears to have chosen not to address this argument in his opposition papers to the within motion.

within the scope of his or her employment, are legally incapable of conspiring with each other." *Crews v. County of Nassau,* No. 06–CV–2610, 2007 WL 4591325, at *12, 2007 U.S. Dist. LEXIS 94597, at *42 (E.D.N.Y. Dec. 27, 2007) (citing cases); *see also Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978) ("[T]here is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment."). An exception to the doctrine is where defendants are acting outside the scope of their employment when the alleged conspiracy is created. *See Crews,* 2007 WL 4591325, at *12, 2007 U.S. Dist. LEXIS 94957, at *43. To demonstrate this exception, "a plaintiff must show that defendants were 'acting in their personal interests, wholly and separately from the corporation' or municipal entity." *Id.* at *12, 2007 U.S. Dist. LEXIS 94957 at *43 (quoting *Bhatia v. Yale Univ.,* No. 3:06cv1769, 2007 WL 2904205, at *2, 2007 U.S. Dist. LEXIS 73849, at *4–5 (D.Conn. Sept. 30, 2007)).

▮▮ Here, Cancellieri and Suozzi, as well as their "designees" whom Williams alleges to have entered into a conspiracy, "are all employees of a single municipal entity—Nassau County." *Crews,* 2007 WL 4591325, at *12, 2007 U.S. Dist. LEXIS 94597, at *42–43. Moreover, Williams has not offered any evidence—let alone even alleged—that the defendants were acting outside the scope of their employment when they partook in the alleged conspiracy. Accordingly, any purported conspira-

torial agreement among them is barred by the intracorporate conspiracy doctrine.[21]

Based on the foregoing, I recommend that summary judgment be granted in defendants' favor with respect to Williams' Section 1983 conspiracy claim and that the claim be dismissed.

## IV. *Pellegrini's Race and Age Discrimination Claims*

▮▮ Claims of racial discrimination in violation of Title VII and age discrimination pursuant to the ADEA are both evaluated according to the three-part burden shifting test enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Sciarrino v. Municipal Credit Union,* 894 F.Supp. 102, 106 (E.D.N.Y.1995) ("Under the Supreme Court decisions in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), claims of racial discrimination in violation of Title VII ... are analyzed under a three-part test."); *see also Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir. 2000) ("We have explained that we analyze ADEA claims under the same framework as claims brought pursuant to Title VII."). Under that framework, plaintiff must first establish a prima facie case of discrimination, "for which the burden is 'minimal.'" *Baur v. Rosenberg, Minc, Falkoff & Wolff,* No. 07 Civ. 8835, 2008 WL 5110976, at *3, 2008 U.S. Dist. LEXIS 99819, at *8 (S.D.N.Y. Dec. 2, 2008). With respect to racial discrimination, a prima facie case is demonstrated by proof of the following: (1) plaintiff is a member of a protected

---

**21.** Although not specifically pleaded in the Amended Complaint, Williams also appears to allege that defendants Cancellieri, Suozzi and Arthur Gianelli, the DCE for the Nassau County Management, Budget and Finance Department, conspired to terminate Williams in retaliation for his public speech. (Pl. Mem. of Law 18–19.) However, as all three individuals are all employees of Nassau County, any alleged conspiracy would also be barred on intra-corporate conspiracy doctrine grounds.

class; (2) plaintiff was qualified for the position; (3) plaintiff suffered an adverse employment action; and (4) the adverse employment action "occurred under circumstances giving rise to an inference of discrimination." *Baldwin v. North Shore Univ. Hosp.*, 470 F.Supp.2d 225, 228 (E.D.N.Y.2007); *see also de la Cruz v. New York City Human Res. Admin.*, 82 F.3d 16, 20 (2d Cir.1996). Similarly, a prima facie case of age discrimination requires plaintiff to demonstrate that (1) she was within the protected age group; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under "circumstances giving rise to an inference of unlawful discrimination." *Baur*, 2008 WL 5110976, at *3, 2008 U.S. Dist. LEXIS 99819, at *8; *see also Schnabel*, 232 F.3d at 87.

Once the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the employer to articulate a "legitimate, nondiscriminatory reason for the adverse employment action." *Baldwin*, 470 F.Supp.2d at 230; *see also Schnabel*, 232 F.3d at 87. If the employer is able to meet its burden, the plaintiff must then "prove that the articulated justification is in fact a pretext for discrimination . . . ." *Baldwin*, 470 F.Supp.2d at 230; see also *Baur*, 2008 WL 5110976, at *3, 2008 U.S. Dist. LEXIS 99819, at *9. "[A]lthough intermediate evidentiary burdens shift back and forth under this framework, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

In the within action, Pellegrini has successfully established a prima facie case of race and age discrimination. Pellegrini was fifty-one years old at the time of her termination and is Caucasian, which are considered protected classes under Title VII and the ADEA. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 279, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (stating that Title VII prohibits racial discrimination against Caucasians on the same terms as racial discrimination against non-Caucasians); *see also* 29 U.S.C. 631(a) (limiting the prohibitions of the ADEA to persons over the age of 40). Moreover, there is no dispute that Pellegrini was qualified for the position she held in OHIA. It is similarly undisputed that Pellegrini suffered an adverse employment action in that she was terminated. Finally, the fact that Pellegrini was replaced by a younger, Hispanic woman, Michelle Marquez, gives rise to an inference of discrimination for purposes of establishing a prime facie case. *See Meiri v. Dacon*, 759 F.2d 989, 996 (2d Cir.1985) (holding that although Title VII does not require proof that a protected class member was replaced by a non-protected class member, evidence of such raises an inference of discrimination).

The burden then shifts to the County, who has also successfully met its burden, and has articulated a legitimate, nondiscriminatory reason for Pellegrini's termination—namely, her difficult working relationship with defendant Sylver. It is undisputed that Pellegrini and Sylver did not work well together. A review of the deposition transcripts provided in connection with the within motion makes that fact clear. Pellegrini herself testified that her relationship with Sylver was "adversarial" and "confrontational." (Pellegrini Dep. 101–03.) Similarly, Sylver testified that he found it difficult to "get a straight answer" from Pellegrini when he would ask her a question, (Sylver Dep. 45–46), and that on at least two occasions, Pelle-

grini refused to carry out certain instructions that Sylver had specifically given her with respect to the withdrawal of HUD funds that were not being utilized by the Town of Hempstead. (Sylver Dep. 96–100.) Sylver characterized Pellegrini's behavior in this instance as "insubordinate." (Sylver Dep. 100.)

The defendants' assertions constitute valid reasons for terminating Pellegrini. *See Baur,* 2008 WL 5110976, at *4, 2008 U.S. Dist. LEXIS 99819, at *11 ("[I]t is well-settled that an employer may permissibly terminate an employee based on inappropriate comments, perceived insubordination, or disruptive behavior in the workplace.") (citing cases). While Pellegrini may not agree with the reasons for her termination, the "general rule" is that "an employer can suspend or discharge an employee at will for any reason, wise or unwise, fair or unfair, as long as this decision is not based on discrimination." *Baldwin,* 470 F.Supp.2d at 233. Accordingly, the burden then shifts back to Pellegrini to demonstrate that defendants' reasons are nothing more than a pretext for discrimination.

To demonstrate pretext, Pellegrini must demonstrate through admissible evidence "circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant[s'] employment decision was more likely than not based in whole or in part on discrimination." *Baur,* 2008 WL 5110976, at *3, 2008 U.S. Dist. LEXIS 99819, at *10 (quoting *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003)). "At the very least, [Pellegrini] must introduce evidence raising an issue of material fact as to whether the [County] has honestly and truthfully set forth [its] reasons for firing her." *Baur,* 2008 WL 5110976, at *4, 2008 U.S. Lexis 99819, at *12 (citing *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000)). This, Pellegrini has failed to do.

The only "evidence" that Pellegrini offers in support of her race and age discrimination claims is a conclusory allegation in her declaration in opposition to the defendants' motion that since Michelle Marquez "did not have the experience, qualifications, and demonstrated abilities that [she] had," Pellegrini "therefore had to conclude that [her] age, race and color, along with [her] speech on matters of public concern, were the reasons for [her] termination." (Pellegrini Decl. ¶ 32.) This is simply not enough to raise an issue of fact with respect to Pellegrini's race and age discrimination claims. "[P]urely conclusory allegations of discrimination, standing alone, are insufficient to defeat a motion for summary judgment." *Sciarrino,* 894 F.Supp. at 108 (citing *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985)).

Pellegrini has not presented any evidence that she was subjected to comments, whether offensive or not, about her race or her age. Nor has she offered any evidence that she was treated any differently from other individuals with whom she worked on the basis of her race or her age. "In fact, beyond the minimal proof required to state a prima facie case, [Pellegrini] has offered no evidence that [she] was discriminated against because of her [race or] age." *Schnabel,* 232 F.3d at 88 (emphasis omitted). As such, defendants are entitled to a judgment as a matter of law with respect to Pellegrini's claims of discrimination. "Absent evidence of discrimination, it is not the province of the Court to sit as a super-personnel department that reexamines an entity's business decisions." *Baur,* 2008 WL 5110976, at *5, 2008 U.S. Dist. LEXIS 99819, at *13–14 (quotation omitted).

Accordingly, I recommend that defendants be granted summary judgment with respect to Pellegrini's Title VII claim for race discrimination and ADEA claim for

age discrimination and that those claims be dismissed.

## V. *Plaintiffs' Claims Pursuant to New York Civil Service Law Section 75–b* [22]

The Report and Recommendation previously issued by the undersigned recommended dismissal of plaintiffs' Section 75–b claims against all defendants except the County. That recommendation was subsequently adopted by Judge Feuerstein. Accordingly, the only Section 75–b claims remaining are those against the County.

■ As a "condition precedent" to commencing an action against New York municipalities, New York General Municipal Law § 50–e requires plaintiffs to file a notice of claim within ninety days after the claim arises. *Chesney v. Valley Stream Union Free Sch. Dist.*, No. 05 Civ. 5106, 2006 WL 2713934, at *1, 2006 U.S. Dist. LEXIS 68137, at *2 (E.D.N.Y. Sept. 22, 2006). Similarly, Section 52 of the New York County Law requires the service of a notice of claim "in accordance with section fifty-e of the general municipal law" for "[a]ny claim ... against a county for damage, injury or death, or for invasion of personal or property rights, of every name and nature," as well as "any other claim for damages ... alleged to have been caused or sustained in whole or in part because of any misfeasance, omission of duty, negligent or wrongful act on the part of the county, its officers, agents, servants or employees." N.Y. County Law § 52.

"Notice of claim requirements are generally strictly construed, and failure to comply with the requirements typically results in dismissal due to failure to state a cause of action." *Chesney*, 2006 WL 2713934, at *9, 2006 U.S. Dist. LEXIS 68137, at *26 (citing *Hardy v. New York City Health and Hosp. Corp.*, 164 F.3d 789, 793–94 (2d Cir. 1999)). There is no dispute here that plaintiffs failed to file a notice of claim with respect to their Section 75–b claims.

■ The prior Report and Recommendation, dated March 15, 2005, on defendants' motion to dismiss, informed plaintiffs that pursuant to New York General Municipal Law § 50–e(5), "[u]pon application, the court, in its discretion, may extend the time to serve a notice of claim...." N.Y. Gen. Mun. Law § 50–e(5). "All applications under [that] section shall be made to the supreme court or to the county court" in certain counties. N.Y. Gen. Mun. Law § 50–e(7). It is also undisputed that plaintiffs failed to exercise this option.[23]

Although the New York Court of Appeals has not ruled on the issue, numerous cases in this circuit have interpreted General Municipal Law Section 50–e(7) to mean that the "[f]ederal courts do not have jurisdiction to hear complaints from plaintiffs who have failed to comply with the notice of claim requirement, or to grant permission to file a late notice." *Van Cortlandt v. Westchester County*, No. 07 Civ. 1783, 2007 WL 3238674, at *8, 2007

**22.** New York Civil Service Law Section 75–b is one of the state's "whistleblower" statutes. *See Calabro v. Nassau Univ. Med. Ctr.*, 424 F.Supp.2d 465, 474 (E.D.N.Y.2006); *Scheiner v. N.Y. Health & Hosps. Corp.*, 152 F.Supp.2d 487, 494 (S.D.N.Y.2001). Under the statute, a public employer is precluded from terminating or taking any "disciplinary or other adverse personnel action" against a public employee "because the employee discloses to a government body information: (i) regarding a violation of a law, rule or regulation which

violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action." N.Y. Civ. Serv. Law § 75–b(2)(a).

**23.** Plaintiffs do not address this issue—or, for that matter, their Section 75–b claims at all—in their opposition to defendants' motion for summary judgment.

U.S. Dist. LEXIS 80977, at *23–24 (S.D.N.Y. Oct. 31, 2007) (citing cases); *see also Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 540 (2d Cir.1999) (noting that "[t]he appropriate *state* court may extend the time to file a notice of claim" but declining to decide "whether the federal court has such jurisdiction") (emphasis added); *Costabile v. County of Westchester*, 485 F.Supp.2d 424, 431 (S.D.N.Y.2007) (finding that due to Section 50–e(7) of the New York General Municipal Law, the court "lack[s] jurisdiction to decide plaintiffs' application to serve a late notice of claim").

Plaintiffs were previously advised of the procedural defect with respect to their state law claims and were further advised of the options available to them to remedy this defect. Plaintiffs failed to avail themselves of those options. Accordingly, their state law claims pursuant to Section 75–b of the New York Civil Service Law fail as a matter of law.

Based on the foregoing, I recommend that defendants be granted summary judgment with respect to plaintiffs' claims under Civil Service Law Section 75–b and that those claims be dismissed.

VI. *Whether the CSC and OHIA are Suable Entities*

■ Defendants assert that the CSC and OHIA are not suable entities because they are merely agencies of the County and lack any separate legal identity. Although plaintiffs challenge defendants assertions with respect to the CSC, their opposition makes no such argument with respect to OHIA. Accordingly, the undersigned assumes that plaintiffs agree that OHIA is not a suable entity. Moreover, it seems clear to the undersigned that OHIA is an office of the County, in the same way as the other various County departments, such as Planning and the Management, Budget and Finance Department, are. As such, it has no legal identity separate and apart from the County and any claims against it are claims against the County of Nassau. *See Hall v. City of White Plains*, 185 F.Supp.2d 293, 303 (S.D.N.Y.2002) ("Under New York law, departments which are merely administrative arms of a municipality, do not have a legal identity separate and apart from the municipality and cannot sue or be sued.") (citing cases). For these reasons, I recommend that plaintiffs' claims against OHIA be dismissed.

■ With respect to the CSC, defendants assert that it exists by virtue of Article XIII of the Nassau County Charter. Plaintiffs, however, insist that the CSC is a creature of state law, not County law. Although Article XIII of the Nassau County Charter specifies that a department of civil service shall exist within the County and how it shall be administered, it appears that the power to create that entity is derived from the New York State Civil Service Law. *See* N.Y. Civ. Serv. Law § 15 (providing for the creation of "municipal civil service commissions"); *see also Pearse v. Inc. Village of Freeport*, No. CV 81–1217, 1982 WL 31021, 1982 U.S. Dist. LEXIS 13456, at *4 (E.D.N.Y. May 3, 1982) ("The New York State Civil Service Law, §§ 15, 17, allows for the establishment of local forms of Civil Service Administration.").

Moreover, as plaintiffs point out, the CSC has been a party to numerous actions in the past, as both plaintiff and defendant. (Pl. Ex. GG.) An independent search by the Court found more than one hundred cases in both the federal and state courts of New York where the CSC was a named party. Unlike the case law cited by the defendants with respect to those agencies that are clearly municipal entities (*e.g.*, county police departments), the defendants have not offered, nor did the Court's inde-

pendent research produce, any cases where a court held that a county civil service commission does not have the capacity to sue or be sued.[24] In addition, several of defendants' own witnesses testified at their depositions that although the CSC interacts quite extensively with the County, it is a separate and distinct entity, independent of the Nassau County government. (Cancellieri Dep. 23; Senko Dep. 11; Gugerty Dep. 12–14; Suozzi Dep. 63.)

Accordingly, I recommend that the CSC be considered an independent legal entity rather than an agency or office of the County and, as such, is appropriately subject to suit by plaintiffs.

### RECOMMENDATION

For the foregoing reasons, I recommend that defendants' motion for summary judgment be granted in part and denied in part. Specifically, I recommend that defendants be granted summary judgment with respect to the following claims contained in the Amended Complaint: (1) the conspiracy claim pursuant to 42 U.S.C. § 1983; (2) the race discrimination claim pursuant to Title VII; (3) the age discrimination claim pursuant to the ADEA; and (4) the state law whistleblower claim pursuant to New York Civil Service Law § 75–b. I further recommend that the Nassau County Office of Housing and Intergovernmental Affairs be dismissed from this action on the grounds that it is an administrative agency of the County of Nassau and has no legal identity separate and apart from the County. In all other respects, I recommend that defendants' motion be denied.

### OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a copy to the undersigned within ten (10) days of the date of this report. Failure to file objections within ten (10) days will preclude further appellate review of the District Court's order. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), and 72(b); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Frank v. Johnson,* 968 F.2d 298 (2d Cir.1992), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam).

**SO ORDERED.**

Dated: Central Islip, New York.

February 2, 2009.

---

**24.** The undersigned notes that in one case, *Cullen v. New York State Civil Serv. Comm'n,* 435 F.Supp. 546 (E.D.N.Y.1977), the court held that "for purposes of § 1983 jurisdiction, the civil service commissions named as defendants are simply departments of state, county and municipal governments and, therefore, can not be 'persons' within the meaning of the statute." *Id.* at 557. However, the Court's research has not produced a single other case within the federal or state courts of New York with a similar holding. Moreover, based on the subsequent history of *Cullen,* it is unclear whether it is still considered "good law."